# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-244

CRAIG STEVEN ARABIE, ET AL.

VERSUS

CITGO PETROLEUM CORPORATION, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-2738
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and James T. Genovese, Judges.

**AFFIRMED.**

M. Dwayne Johnson
Charles S. McCowan, Jr.
Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, L.L.P.
P. O. Box 3513
Baton Rouge, LA 70825
Telephone: (225) 387-0999
COUNSEL FOR:
    Other - Louisiana Chemical Association

William B. Baggett
Wells Talbot Watson
Baggett, McCall, Burgess, Watson & Gaughan
P. O. Drawer 7820
Lake Charles, LA 70606-7820
Telephone: (337) 478-8888
COUNSEL FOR:
    Plaintiffs/Appellees - Bennett Talbot, Jason Doucet, Jerry Richard, Jr., John
    Giovanni, Glen Miller, Dennie Bankston, Charles Hardy, Dexter Breaux, Scott
    Levy, Craig Steven Arabie, Jimmy Buckelew, Larry Thomas, Joseph Burnett,
    and Randall Fontenot

**Peter J. Butler**
**2000 Belle Chase Hwy - Third Floor**
**Gretna, LA 70056**
**Telephone: (504) 433-9350**
**COUNSEL FOR:**
  **Plaintiffs/Appellees - Bennett Talbot, Jason Doucet, Jerry Richard, Jr., John Giovanni, Glen Miller, Dennie Bankston, Charles Hardy, Dexter Breaux, Scott Levy, Craig Steven Arabie, Jimmy Buckelew, Larry Thomas, Joseph Burnett, and Randall Fontenot**

**Michael Kenneth Dees**
**P. O. Box 3753**
**Lake Charles, LA 70602**
**Telephone: (337) 439-3661**
**COUNSEL FOR:**
  **Lake Charles Harbor & Terminal District**

**Mat Marion Gray, III**
**E. Stuart Ponder**
**400 Poydras Street - 30th Floor**
**New Orleans, LA 70130**
**Telephone: (504) 523-2600**
**COUNSEL FOR:**
  **Other - Louisiana Surplus Lines Association**

**Robert E. Landry**
**Scofield, Gerard, Singletary & Pohorelsky, L.L.C.**
**901 Lakeshore Drive - Suite 900**
**Lake Charles, LA 70601**
**Telephone: (337) 433-9436**
**COUNSEL FOR:**
  **Defendant/Appellant - Citgo Petroleum Corporation**

**Kirk Albert Patrick, III**
**Law Offices of Donohue Patrick**
**450 Laurel Street - Suite 1500**
**Baton Rouge, LA 70801**
**Telephone: (225) 214-1908**
**COUNSEL FOR:**
  **Defendant/Appellee - R & R Construction, Inc.**

**Yul Dubart Lorio**
**Doucet, Lorio & Moreno**
**One Lakeshore Drive - #1600**
**Lake Charles, LA 70629**
**Telephone: (337) 433-0100**
**COUNSEL FOR:**
  **Defendant/Appellant - Citgo Petroleum Corporation**

**Marshall Joseph Simien, Jr.**
**Simien Law Firm**
**Capital One Tower - Suite 1110**
**One Lakeshore Drive**
**Lake Charles, LA 70629**
**Telephone: (337) 497-0022**
**COUNSEL FOR:**
  **Defendant/Appellant - Citgo Petroleum Corporation**

**Patrick Craig Morrow, Jr.**
**Morrow, Morrow, Ryan & Bassett**
**P. O. Drawer 1787**
**Opelousas, LA 70570**
**Telephone: (337) 948-4483**
**COUNSEL FOR:**
> **Others - BMF Partnership's, Louisiana Landowner, Rice Farmers, Bradley Zaunbrecher, and Kyle Smith**

**Richard Edward Sarver**
**Barrasso, Usdin, Kupperman, Freeman & Sarver, L.L.C.**
**909 Poydras Street - Suite #2400**
**News Orleans, LA 70112**
**Telephone: (504) 589-9700**
**COUNSEL FOR:**
> **Defendant/Appellant - Citgo Petroleum Corporation**

**Richard Elliott Wilson**
**Cox, Cox, Filo, Camel & Wilson**
**723 Broad Street**
**Lake Charles, LA 70601**
**Telephone: (337) 436-6611**
**COUNSEL FOR:**
> **Plaintiffs/Appellees - Bennett Talbot, Jason Doucet, Jerry Richard, Jr., John Giovanni, Glen Miller, Dennie Bankston, Charles Hardy, Dexter Breaux, Scott Levy, Craig Steven Arabie, Jimmy Buckelew, Larry Thomas, Joseph Burnett, and Randall Fontenot**

**THIBODEAUX, Chief Judge.**

The defendant-appellant, CITGO Petroleum Corporation (CITGO), released wastewater and slop oil from its Lake Charles refinery in 2006 when its wastewater treatment unit (WWTU) overflowed following six inches of rainfall over a three-hour period. Fourteen plaintiffs (the appellees) working down-river of the release site brought suit for damages resulting from exposure to toxic chemicals in the oil and wastewater.

The trial court found CITGO liable and awarded each plaintiff compensatory damages, general damages, and fear of future injury damages. The trial court also assessed litigation costs to CITGO and awarded punitive damages against CITGO in the amount of $30,000.00 per plaintiff. The total damages awarded to each plaintiff did not exceed $50,000.00. CITGO filed this appeal. We affirm the judgment of the trial court.

I.

## ISSUES

We must decide:

(1)    whether CITGO's actions were the proximate cause of the plaintiffs' injuries;

(2)    whether the trial court manifestly erred in awarding damages for fear of future injury;

(3)    whether the trial court erred in failing to allocate a portion of the fault to the plaintiffs and to third parties; and,

(4)    whether the trial court erred in awarding punitive damages.

## FACTS AND PROCEDURAL HISTORY

On June 19, 2006, CITGO released over four million gallons of hazardous slop oil and seventeen million gallons of wastewater into the Calcasieu River from the storm surge storage tanks in the CITGO Refinery's waste water treatment unit (WWTU) in Lake Charles. The WWTU was built in 1994. Its purpose was to treat wastewater from the CITGO Refinery and discharge it into the Calcasieu River. The WWTU contained two ten-million gallon storm tanks which were designed to store untreated water. The tanks were equipped with skimmers to remove oil from the water, but the skimmers had not been functional since shortly after the WWTU was operational. Approximately eight feet of slop oil accumulated underneath the water in the tanks. The tank levels were not drawn down before the storm and flooding leading to the release. The capacity overload of the two tanks during the heavy rainfall in a short period of time caused the tanks to overflow; the dike around the tanks failed; and, CITGO released twenty-one million gallons of oil and wastewater into Calcasieu waterways.

The slop oil, which contains hydrogen sulfide and benzene among other toxic chemicals, ran into the Calcasieu River, affecting approximately one hundred miles of shoreline. Within two days it had migrated to the Ron Williams Construction site where the plaintiffs were working at the riverside location of the Calcasieu Refining Company (CRC). CRC is a small plant that is basically an island, with only one roadway connecting it to land. The plaintiffs' work site was encircled with the mixture. CITGO implemented a two-month clean-up project near and on the CRC work site. Booms used to soak up the oil were deposited in a large dumpster, called a roll-off box, approximately thirty feet from the plaintiffs' lunch and break

2

tent. Plaintiffs also attended daily construction meetings in this area. One of the plaintiffs vomited shortly after arriving at the work site on the first work-day after the release. Some of the plaintiffs working on the dock area at CRC were directly exposed to the water and slop oil and alleged rashes and peeling skin as a result of the exposure. As a result of inhaling the vapors from the chemicals in the slop oil, the plaintiffs alleged respiratory and central nervous system injuries including, but not limited to, headaches, nausea, dizziness, as well as eye, nose, and throat problems.

The fourteen plaintiffs from the Ron Williams Construction site at CRC cumulated their actions and filed suit against CITGO and R & R Construction, Inc. (R & R), in May of 2007. R & R was under contract with CITGO to provide construction services for a new levee system around a third storm water tank being built at the WWTU and was allegedly negligent in building the unit's junction box.

On September 17, 2008, CITGO entered a plea agreement in federal court for "Negligently Discharging a Pollutant from a Point Source into the Navigable Waters of the United States in violation of Title 33 of the United States Code." In the plea agreement, CITGO agreed to pay a criminal fine in the amount of thirteen million dollars in exchange for the Government's agreement to forgo additional criminal prosecution for any other environmental offenses that occurred before the agreement and were known to the Government at the time of the signing of the plea agreement. The offenses specifically included discharges of pollutants, Clean Air Act violations, record keeping violations, and disposal and treatment violations.

On September 19, 2008, the trial court issued two judgments in favor of the plaintiffs, granting them summary judgment on the issues of comparative fault (1) of the plaintiffs, and (2) of their employer, Ron Williams Construction, and the premise owner, CRC.

In March of 2009, CITGO and R & R filed a joint admission of fault for the release of slop oil from the CITGO refinery. In that document, CITGO agreed to "pay (upon final judgment after all appeals) plaintiffs for all their compensatory damages assessed to CITGO and R & R, if any, that plaintiffs are able to prove to the Court were proximately caused by such release from the CITGO refinery in Calcasieu Parish, Louisiana, on or about June 19, 2006."

The plaintiffs amended their suit to include the defendants' liability for punitive damages as well as compensatory damages. They asserted that CITGO's corporate management—headquartered in Tulsa prior to 2004, and in Houston thereafter—made decisions in the early 1990s to intentionally underbuild the 1994 WWTU by deleting a third storage tank from the original project plan in order to save millions of dollars. The engineering for the project design of the third tank was approved in 2004, and the funds for construction were approved in 2005. The plaintiffs further asserted that, due to engineering delays caused by CITGO's corporate management and the priority given to profit-centered projects, the third tank was not under construction until 2006 and was not complete and operational when the flooding and release occurred in June of 2006. The plaintiffs further asserted that, under a conflict of law analysis, the defendants are liable for punitive damages under the punitive damage statutes of Oklahoma and Texas, the two states where the corporate decisions, and thus the damage-causing conduct, occurred.

Following a lengthy trial, the trial court agreed with the plaintiffs and entered judgment on October 22, 2009. CITGO appeals the trial court's judgment on the issues of causation, punitive damages, and costs. CITGO also asserts as error the trial court's failure to allocate portions of the fault to the plaintiffs and their employer, Ron Williams Construction, and to the premise owner, CRC. For the reasons fully

set forth below, as to the issues raised by CITGO in this appeal, we affirm the October 22, 2009 judgment of the trial court and the September 19, 2009 judgments on allocation of fault.[1]

## III.

## LAW AND DISCUSSION

### Standard of Review

When an appellate court finds that a reversible error of law was made in the trial court, it must conduct a de novo review of the entire record and render a judgment on the merits. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993). Regarding factual findings, a two-tiered test must be applied in order to reverse the findings of the trial court: (a) the record reveals that a reasonable factual basis does not exist for the finding of the trial court; and (b) the record establishes that the finding is clearly wrong (manifestly erroneous). *Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonably based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier

---

[1] The plaintiffs filed an opposition to CITGO's appeal. However, rather than answer this appeal by CITGO, the plaintiffs filed a separate appeal of their own, No. 10-334, now pending in this court, which assigns errors and requests increases in compensatory damages. Therefore, we will not address the plaintiffs' appeal or the quantum of their individual compensatory damages in this opinion.

of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

## Causation

In a personal injury suit, a plaintiff must prove causation by a preponderance of the evidence. The test for determining the causal relationship between an accident and injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603 (La. 2/20/95), 650 So.2d 757.

Citing *Molden v. Georgia Gulf Corp*, 465 F.Supp. 2d 606 (M.D.La. 2006), *In re Ingram Towing Company*, 1995 WL 241828 (E.D.La.1995), and *Schexnayder v. Exxon Pipeline Company*, 01-1236 (La.App. 5 Cir. 3/13/02), 815 So.2d 156, CITGO contends that the plaintiffs lacked scientific evidence that they were exposed to harmful or unsafe levels of any chemical sufficient to prove that CITGO caused the injuries alleged. We disagree. *Molden* involved exposure to low concentrations of phenol; *Ingram* involved a diesel spill with exposure below the level allowed by OSHA workplace standards; and, *Schexnayder* involved a denial of damages for physical injury where residents sued for exposure to crude oil vapors. Conversely, the present case involves the plaintiffs' exposure to a mixture of toxic chemicals, called slop oil, for which there is no government-issued permissible exposure guideline.

*CITGO's MSDS on Slop Oil*

CITGO's own Material Safety Data Sheet (MSDS) on "Slop Oil," dated March, 29, 2006, ranks it as a chronic health hazard and a fire hazard. The MSDS section entitled "Emergency Overview" states that the oil is extremely flammable and poisonous; it contains hydrogen sulfide gas which may be fatal if inhaled. The vapors may cause flash fire or explosion and may travel a considerable distance. It further states that the product is harmful or fatal if swallowed; it can enter the lungs and cause damage. Notably, among numerous other chemicals, slop oil contains benzene, a known cancer hazard which can cause leukemia and other blood disorders. In addition to hydrogen sulfide and benzene, the MSDS also states that slop oil contains xylene, toluene, n-Hexane, hexane, heptane, octanes, nonane, ethylbenzene, and trimethylbenzenes.

Under the section entitled "Regulatory Information," the MSDS explains that slop oil and/or its components are listed on the Toxic Substances Control Act (TSCA) inventory and that it contains above *de minimus* levels of the toxins xylene, toluene, n-Hexane, ethylbenzene, benzene, and hydrogen sulfide. The MSDS further states that slop oil may be subject to Proposition 65 in California, a state where the components toluene, ethylbenzene, and benzene are known to cause cancer and birth defects or other reproductive harm.

The MSDS states that breathing the gas or vapor from slop oil may cause severe nose, throat, respiratory tract, and lung irritation, respiratory paralysis, and death. Symptoms include coughing, choking, or shortness of breath. Additionally, inhalation may cause central nervous system depression with symptoms including nausea, headache, dizziness, fatigue, drowsiness or unconsciousness. It can cause eye irritation with tearing, redness, stinging or burning, and can cause swelling of the

7

eyes with blurred vision. Skin contact can cause skin irritation with redness, itching, burning or swelling of the skin and may cause harmful effects in other parts of the body. Ingesting slop oil can cause stomach or intestinal upset with pain, nausea, and/or diarrhea. If the material gets into the lungs during swallowing or vomiting, it can cause lung damage, possibly leading to chronic lung dysfunction or death.

Pursuant to the MSDS, even subacute exposure to low levels of hydrogen sulfide can produce eye irritation, watering, light sensitivity and corneal opacity, bronchitis, pulmonary edema, nausea, abdominal cramps, diarrhea, lung cavity formation, and chronic lung dysfunction. Under the "Conditions Aggravated" section, the MSDS states that organs or organ systems that may be aggravated by significant exposure to this material or its components include: skin, respiratory system, peripheral nervous system, central nervous system (CNS), blood-forming system, and auditory system. The MSDS explains under the "Target Organs" section that exposure to slop oil may cause damage to the blood, kidneys, lungs, liver, mucous membranes, heart, lymphatic system, peripheral nervous system, upper respiratory tract, immune system, skin, auditory system, bone marrow, central nervous system (CNS), eye, lens or cornea, and testes. Slop oil further contains material which may cause damage to the reproductive system, pituitary gland, and thyroid.

Under the section entitled "Carcinogenic Potential," CITGO's MSDS on slop oil states that the carcinogenic effects of ethylbenzene are classified as 2B, possible for humans; and the carcinogenic effects of benzene are classified as 1, proven for humans.

*Medical Reports and Expert Testimony*

While the symptoms varied for each plaintiff, the related symptoms included health issues identified on CITGO's own MSDS, such as nausea, dizziness,

diarrhea, fatigue, headaches, sinus problems, vomiting, shortness of breath, burning eyes, sore throat, insomnia, and rash. All of the plaintiffs were examined by Dr. Robert Looney of Health Associates of Lake Charles, whose individual reports supported exposure symptoms in varying degrees for each plaintiff. Some of the plaintiffs were examined by Dr. Steve F. Springer of Lake Charles, who found symptoms consistent with the adverse health effects listed on CITGO's MSDS and assessed petroleum exposure.

Likewise, Dr. Bryan Paul Barrilleaux with St. Luke's Diagnostic Clinic of Lake Charles, who examined all of the plaintiffs on behalf of CITGO, reported evidence of exposure. As to his medical opinions, only one report was admitted into evidence by CITGO. Dr. Barrilleaux was not called as a witness at trial, nor was he deposed prior to trial. However, in the one report entered into evidence, Dr. Barrilleaux opined that Mr. Arabie's symptoms relating to smell, burning eyes, nausea, and dizziness were "consistent with an irritant/noxious fume exposure." Dr. Barrilleaux did not agree that certain of Mr. Arabie's symptoms were related to exposure, and he did not agree that the symptoms would persist beyond the exposure period. As to the other plaintiffs, Dr. Barrilleaux found some symptoms of each plaintiff "consistent with an irritant/noxious fume exposure." All reports of Dr. Barrilleaux were individually reviewed aloud by Dr. Barry Levy from the witness stand during Dr. Levy's trial testimony.

Dr. Barry Stephen Levy testified on causation at trial and was accepted as an expert in the fields of occupational and environmental medicine, and in the field of epidemiology. He possesses impeccable academic and experiential credentials and has received numerous awards from professional organizations for his contributions to public, occupational, and environmental health.

Since 1993, Dr. Levy has been an Adjunct Professor of Public Health at Tufts University School of Medicine. He has authored numerous articles and edited and co-edited eight books on occupational and environmental health. Since 1994, Dr. Levy has also been a consultant in occupational and environmental medicine with private companies and with federal agencies. He has consulted with the National Institute for Occupational Safety and Health (NIOSH), the Occupational Safety and Health Administration (OSHA), the Environmental Protection Agency (EPA), the National Academy of Sciences (NAS), the World Health Organization, the World Bank, the National Birth Defects Center, and the Harvard Institute for International Development. Throughout his career, Dr. Levy has treated or evaluated individuals, in the range of 3,500 to 4,000 patients, with work-related or environmentally related problems.

Dr. Levy testified at trial regarding the specific damages claimed by each individual plaintiff. In so doing, he established a causative link between the plaintiffs' exposure to CITGO's slop oil and certain specific symptoms of each of the fourteen individuals, while declining to relate other specific symptoms of each individual plaintiff to the slop oil release. Dr. Levy found that, "more likely than not to a reasonable degree of medical probability," some symptoms of each one of the fourteen plaintiffs, including certain respiratory and central nervous system problems, were related to the spill. While individual symptoms varied, the related symptoms included health issues identified on CITGO's own MSDS, such as nausea, dizziness, diarrhea, fatigue, headaches, sinus problems, vomiting, shortness of breath, burning eyes, sore throat, insomnia, and rash.

Most of the related problems were the result of inhaling the toxic fumes of the slop oil mixture on the water surrounding the CRC work site, but two of the

plaintiffs had skin problems specifically related to touching the water. Other plaintiffs had pre-existing conditions, such as a blood disorder in one case and a nasal bone defect in another case, which Dr. Levy considered in making his determinations. Some of the new symptoms that he declined to specifically relate for purposes of causation were earache, unsteadiness, chest pains, gas, gurgling stomach, upset stomach, decreased bowel movements, flu-like aches and pains, and increased difficulty in controlling diabetes. During his trial testimony, Dr. Levy made it clear that he was not providing an opinion on chronic symptoms, generally those lasting a year or longer, but he was relating some symptoms for some individuals for up to a year's duration. Our review indicates that, depending upon the individual plaintiff, the various symptoms that Dr. Levy found to be related to exposure to the spill ran the gamut of one to twelve months in duration.

In arriving at his opinion on causation, Dr. Levy interviewed each plaintiff and studied their individual medical reports, their depositions, and the depositions of their family members and doctors. He studied the MSDS issued by CITGO in March of 2006, prior to the spill, and the reports and depositions of experts and individuals supplying information relevant to estimating the exposures. He also scrutinized numerous texts and epidemiological studies and articles on oil spills and the resulting physical and mental injuries on individuals and groups exposed to toxic substances as compared to unexposed groups.

CITGO argues that Dr. Levy could not identify any air monitoring data showing that any plaintiff was exposed to harmful levels of the chemicals in the slop oil. At trial, Dr. Levy was cross-examined exhaustively by CITGO's attorney on the threshold limit values (TLVs), the time weighted averages (TWAs), and the permissible exposure levels (PELs) issued by OSHA and other government agencies

11

on the individual chemicals in slop oil, particularly benzene, hydrogen sulfide, xylene, toluene, and ethylbenzene. So thoroughly exhaustive was the cross-examination that the trial court on one occasion referred to it as "Sarver v. Levy." Dr. Levy was directly and repeatedly responsive on this issue, articulating that particularly important to this case is the fact that OSHA's PELs and other agency TLVs refer to an exposure to one given chemical at a time, not to multiple chemicals at the same time as present in the slop oil and acknowledged by CITGO.

As an epidemiologist, Dr. Levy studied numerous texts and published articles on the acute health effects of oil spills around the world, including the Prestige oil spill, the Sea Empress oil spill, and the Tasman Spirit tanker spill. While the plaintiffs in this case did not personally assist in the clean-up on the Calcasieu River surrounding their work-site, Dr. Levy opined that their exposure was comparable to the fishermen assisting with clean-up of the Prestige oil spill off the coast of Spain in November of 2002. The fishermen in that study suffered acute respiratory problems, headaches, dizziness, and eye and throat symptoms.

Citing *Young v. Burton*, 567 F.Supp.2d 121 (D.D.C. 2008), CITGO argues that Dr. Levy's reasoning was circular and his methodology flawed because he worked backward from an assumption of causation. We disagree. *Young* involved a former apartment dweller's claims of mold exposure, insufficient evidence of an actual exposure to mold toxins, and a lack of peer-reviewed literature on mold illness and its causes. In the present case, the record is replete with evidence of the plaintiffs having been surrounded by slop oil at their island work site, and Dr. Levy used numerous texts and published epidemiological studies on the health effects of exposure to oil spills in forming his opinion.

12

CITGO also cited *Castellow v. Chevron USA*, 97 F.Supp.2d 780 (S.D.Tex. 2000), a wrongful death suit. There, expert testimony that a deceased service station worker developed acute myelogenous leukemia (AML) as a result of his thirty years of exposure to the benzene contained in gasoline was found unreliable and inadmissible. This was due in great part to the fact that the experts in *Castellow* were operating under the erroneous *assumption* that the decedent not only pumped gas but also used *pure* benzene on a daily basis to wash automotive parts. When the testimony revealed otherwise, and the question became gasoline exposure, the experts were looking at a different case, and the issue turned upon the *absence of studies* showing that gasoline exposure causes AML.[2]

The court's criticism of expert witnesses, who "worked backward" from the conclusion that the decedent's AML was caused by harmful levels of benzene exposure, followed the court's explanation of the experts' erroneous assumption of daily use of "pure" benzene. *Castellow*, 97 F.Supp.2d at 786. It did not follow an attack on a methodology that uses epidemiology studies of other incidents. Further, the court in *Castellow* made it clear that it was not requiring the plaintiffs to produce a *precise level* of benzene exposure, but "merely requiring them to produce information, adequately supported, from which [the hygienist], and the others, [could] make a causal connection." *Id*. at 797.

In fact, *Castellow* is one of a line of cases articulating the importance, usefulness, and conclusiveness of epidemiological studies as evidence in toxic tort

_____

[2]In *Castellow*, 97 F.Supp.2d 780, the court noted that the plaintiffs, the widow and daughter of the deceased Mr. Castellow, in filing their suit, relied upon an affidavit of one of the decedent's former co-workers regarding the employees' daily use of pure benzene; but their case changed when the co-worker testified that the cleaning solvent used at that job only contained an element of benzene. Consequently, the five plaintiffs' experts reviewed new allegations and information, and their reports and opinions changed. One of those experts was Dr. Barry Levy, who testified that the hygienist's calculations were very important in that case, and if those calculations were inaccurate, then he [Dr. Levy] could not offer an opinion as to causation. *Id*. at 794.

cases.  See *Brock v. Merrill-Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir. 1989), *modified by* 884 F.2d 166 (5th Cir. 1989), *cert. denied*, 494 U.S. 1046, 110 S.Ct. 1511 (1990) (lack of conclusive epidemiological proof was fatal to plaintiffs' case); and see *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5 Cir. 1996) (most useful and conclusive evidence is epidemiological studies; numerous reputable epidemiological studies indicate there is not a correlation between ethylene oxide exposure and cancer of the human brain).

The court in *Castellow*, the case cited by CITGO, stated as follows:

> It is accepted that, in evaluating a purported causal link between a chemical agent and a particular disease, epidemiological studies are the most informative.  *See Allen*, 102 F.3d at 196.  One set of criteria, widely used by epidemiologists in the study of disease mechanisms, is the one detailed by Sir Austin Bradford-Hill in 1965.  Richard D. Irons, Ph.D., a toxicologist with an extensive background in hematology, was designated by Defendants as an expert witness in this case.  In submissions before this court, Dr. Irons stated, without contradiction, that scientists generally rely on the Bradford-Hill factors to ascertain valid opinions on medical causation.

*Castellow v. Chevron USA*, 97 F.Supp.2d at 786-87.

At trial, Dr. Levy testified that he determined both general causation, that slop oil and its ingredients can cause various symptoms and health problems, and specific causation, that slop oil exposure caused certain symptoms of each specific plaintiff.  When cross-examined about his methodology, Dr. Levy testified as follows:

> A.  With regard to general causation what I did is a review of the pertinent medical literature both on oil spills and other similar spills that I felt were pertinent to the issues in this case, as well as literature reviews on the various ingredients according to the Material Safety Data Sheets present in the slop oil.  I did that by looking for articles that I had within my own office and chapters in books within my own office, as well as a so-called pub-med search on the database of the National Library of Medicine of NIH, National Institute of

14

Health. I reviewed each article. I not only reviewed each article individually with regard to what was stated, if it was a study, how it was done what the results were, and what could be concluded from the results, and I also looked at the body of literature as a whole with regard to oil spills with regard to certain types of issues related to oil spills such as odors, such as psychological effects as well as individual chemicals that make up slop oil such as benzene, toluene, xylene, ethylbenzene, etcetera, and then came to the conclusions. I applied the Bradford Hill Principles which have to do with strength of association, consistency, specificity, temporality, dose response relationship, biological plausibility and coherence. Those are the primary Bradford Hill Principles.

Q.    Are there nine?

A.    There [are] two others that Dr. Bradford Hill added later. One is called experiment and one basically relates to animal studies and also whether an intervention took place in a given situation. After the intervention you might logically expect, that is removing the exposure, for example, a reduction in symptoms. And the other, the last one was reasoning by analogy. Those two are sometimes cited, but the first seven that I listed are seen as the primary Bradford Hill[] Principles.

Q.    Okay. Go ahead.

A.    So I applied the Bradford Hill Principles in coming to conclusions with regard to the association, the causal association of both oil, as well as the components of the slop oil in causing various symptoms and other health conditions. I also noted other information, for example, Material Safety Data Sheets of Citgo which indeed are relatively consistent with my findings from the literature with regard to the symptoms that slop oil and its constituents can cause. That was my methodology with regard to general causation. It's a fairly standard methodology that I have used many years that scientists, physicians, epidemiologists all use.

Q.    All right. Can you give us a citation to the literature that says, if you are going to come to a conclusion on general causation, this is how you do it?

15

A. One such citation is Dr. Austin Bradford Hill[']s initial paper published I believe in 1965 based on a speech he had given the year before. Another citation is the chapter by Kenneth Rothman in his textbook, *Modern Epidemiology*. It's something I refer to often. I believe the pages are 23 to 28 of that particular chapter in which the principles are laid out and discussed.

Dr. Levy clarified that the Bradford Hill principles are guidelines, not unyielding criteria, stating that, "[i]ndeed, the only one that is essential of the total of nine is temporality, that is[,] the exposure must precede the end point when looking at a body of literature." Accordingly, Dr. Levy relied upon, applied, and cited the same literature and principles as those used and found authoritative by the court in *Castellow v. Chevron*, the case cited by CITGO.

Similarly, with regard to the methodology used in determining specific causation, Dr. Levy detailed his reliance upon information regarding not only the chemicals and chemical mixture at issue, but all relevant information, including the plaintiffs' medical records, interviews, deposition testimony, and other information specific to each individual. Next, he looked at the relevant medical literature, exposure factors, and other factors such as the individual's genetic factors, medications, pre-existing conditions and disorders, infections, allergies, and other exposures, including smoking, that may have caused certain symptoms and illnesses. Using this information, Dr. Levy performed what is referred to as a differential diagnosis or, in his field, a differential etiological analysis, to arrive at a reasonable diagnosis of the disease or adverse health outcome and conclusion, weighing and synthesizing all of the evidence in relation to that given individual. While Dr. Levy did not have error-rate statistics on this methodology, he explained that the inhalation of toxic substances is not analogous to taking a pill for which an absorption rate can be measured in the body.

16

CITGO argues that the blood work and urinalysis results on the plaintiffs were normal in most cases, further indicating no hazardous exposure. However, because the plaintiffs were led to believe that there were no harmful chemicals in the slop oil, they did not seek medical assistance and were not tested until months after the spill. Moreover, Dr. Levy explained that the symptoms or health effects associated with this kind of exposure do not generally lead to abnormalities in the complete blood count (CBC) or the serum chemistries with the uranalysis, and that normal CBCs tends to rule out other etiologies, such as infectious processes, further indicating toxic exposure in these cases. Notwithstanding, Dr. Levy also pointed out that Dr. Springer, who had examined three of the plaintiffs, had found abnormalities consistent with their symptoms. Dr. Levy further stated that phenol testing (for derivatives of aromatic hydrocarbons) is not included in a standard urinalysis, but rather is a special test not performed on the plaintiffs in this case. With regard to benzene testing, urinary phenol testing would have had to occur immediately after the exposure.

Because there was no personal monitoring done on the plaintiffs at the work site, Dr. Levy did not have any dose response or quantitative exposure information, but relied upon qualitative information regarding the plaintiffs' proximity and length of exposure to the slop oil and the chemicals in the slop oil. While admittedly not a toxicologist, Dr. Levy stated that there were at least ten (10) chemicals to be considered in this case, not just the benzene, toluene, xylene, ethylbenzene and hydrogen sulfide, which were the chemicals most discussed in this litigation.

Dr. Angela Harris, CITGO's toxicologist, testified regarding the chemicals in slop oil and the importance of evaluating studies that addressed similar mixtures:

> Q. I'm going to quote directly from your report [where] you said that "Like crude oil, waste treatment slop oil that was spilled was a complex mixture of hundreds of different chemicals," correct?
>
> A. Yes, it is.
>
> Q. And you said, "The exact chemical composition is unknown"?
>
> A. Yes.
>
> . . . .
>
> Q. You said, "The interaction of chemicals in a mixture can be described as additive."
>
> A. That's not the whole sentence, though.
>
> Q. Okay. Well, explain it to us in context, if that's not it.
>
> A. Well, what I was trying to say here was that there are [sic] when you've got a complex mixture, even a simple mixture, there's three possibilities: One is if [sic] it can be additive, meaning that you just add together the effects in a mixture, and that sort of intuitively makes sense; it can be synergistic when one chemical works with another chemical and causes a health effect later, then both of the two combined; or it can be antagonistic where if you're exposed to one chemical, it reduces the adverse effects caused by the other chemical. So, there's [sic] three different things that can happen. And in a mixture of hundreds of different chemicals, there's no way to predict what all those interactions are going to be which is why you want to evaluate literature on a similar mixture.
>
> Q. Good point. Your answer is better than my question.
>
> A. Oh, okay.

Q.    . . . . So you said . . . "The most logical approach in assessing the potential health effects for an individual exposed to slop oil due to cleanup would be to evaluate studies that address the toxicity of slop oil or a similar mixture like crude oil and a cohort similar to the CRC workers.  The advantage of this approach is that any interaction of chemical constituents on health effects will be apparent in the studies involving the mixture as a whole,"  correct?

A.    Correct.

Dr. Mark Roberts, CITGO's expert in environmental medicine, epidemiology, and public health, testified that he did not use any epidemiological studies in preparing and submitting his opinion prior to trial.  Dr. Roberts stated that air monitoring done during the response and cleanup efforts indicated extremely low levels of volatile constituents of the spill outside the immediate spill area of the Citgo refinery.  He opined that not one symptom of a single plaintiff was related to his work-site exposure to the slop oil.  When questioned at trial, Dr. Roberts disagreed with Dr. Levy that the Prestige oil spill study was applicable in this case because the fishermen in that study were involved in the clean-up activities, and the plaintiffs in this case were not.

Frank Parker III testified as an expert in industrial hygiene and safety. He interviewed the plaintiffs, reviewed monitoring records, depositions, CITGO's MSDS, opinions of CITGO's experts, maps, documents and photographs related to the spill, and he consulted the applicable literature, including  published exposure levels and ranges, chemical handbooks, and industrial hygiene and toxicology textbooks.  In his opinion, the plaintiffs' symptomology was the result of their exposure to CITGO's wastewater and slop oil.  Mr. Parker identified four sources of the plaintiffs' exposure:  (1) the vapors that were initially released, especially after the wind turned and started coming toward CRC; (2) the slop oil itself that migrated

to and encircled CRC; (3) the vacuum trucks involved in the clean-up; and, (4) the roll-off boxes near the plaintiffs' lunch/break tent.

Mr. Parker testified that CITGO's release of over four million gallons of slop oil and seventeen million gallons of wastewater created a third substance, a layer of emulsified oil and water and chemicals known as "mousse." He further stated that the slop oil contained numerous hazardous chemicals, that the hydrocarbons attack the central nervous system, and that there is an additive effect. He stated that one cannot look at the chemicals individually but must look at them all together because they all create somewhat the same symptoms. In reviewing CITGO's March 2006 MSDS, which characterizes the slop oil as flammable, Mr. Parker testified that it is the vapor emanating from a chemical, not the liquid form, that burns. He stated that the lower explosive limit for most hydrocarbons is 10,000 to 15,000 parts per million; therefore, the mere fact that slop oil is flammable indicates that there are very high concentrations of hydrocarbons being generated by the material. Mr. Parker further stated that what is considered a safe level of concentration from a fire standpoint is still very hazardous from an occupational health standpoint.

Mr. Parker, who chaired the American Petroleum Institute's Task Force on benzene, stated that benzene is a hydrocarbon that becomes *adsorbed*, not absorbed, into the wastewater. He explained that benzene has a disassociation curve that brings it into water, like putting sugar in tea; it is in a solution but it is not part of the water molecule. It latches onto the water, travels with the water, but it remains benzene. When the vapor pressure in liquids such as benzene, toluene, and xylene is brought down, the propensity of the vapor to come out goes up because there is less pressure holding it down. Therefore, the clean-up activities using vacuum trucks at

the plaintiffs' work site at Calcasieu Refinery created a more significant source of vapors to which they were exposed.

Mr. Parker described the vacuum trucks as "a vacuum still on wheels," a process used to remove the light ends of hydrocarbons. He explained that when the vacuum hose sucks up the water and slop oil, "it reduces the atmospheric pressure which allows these to volatilize much quicker and it exhausts them into the work area." In layman's terms, Mr. Parker explained that the liquid is transferred to an empty tank, causing the displacement of air. The air that is pumped out with an air pump is dumped right at the truck, like an exhaust pipe. The result of extracting these vapors out of the wastewater, out of the slop oil and mousse, and exhausting them, is "higher vapors, higher concentrations coming out of these vapors than you would [have] if they were just exposed to normal atmospheric pressure."

With regard to the roll-off boxes used in the clean-up activities, Mr. Parker explained that the booms used to soak up the slop oil and mousse were placed in a box, which was near the plaintiffs' lunch tent. The vapors generated from the box were so strong that, by way of illustration, Mr. Parker related, "one guy even said it masked out the odor of the chemical toilet." Dexter Breaux, a supervisor at Ron Williams Construction, testified that after he vomited at the dock, he pulled his men off the docks, and they subsequently started moving items from under the lunch tent in order to relocate it. He further testified that he was present when two CITGO men were in the control room at the work-site telling CRC operators that "everything was clear." He stated that, as a result, they did not move the lunch tent.

Mr. Breaux further stated that he asked Jerry Lemons, the safety man at CRC, for an MSDS repeatedly and that Mr. Lemons did not have one. He testified that he did not order respirators for his men because they were told that all was clear.

21

He stated that they did not know about the chemicals until after the odor was gone, which was after the roll-off boxes were removed.

*Monitoring Samples*

CITGO argues that thousands of air samples were taken at CITGO and in the community, showing only low, safe levels of oil constituents. However, no personal monitoring was done on the plaintiffs, and no meaningful monitoring was done at their work site at CRC. CITGO quotes an LDEQ monitoring report stating that "the concentrations of most of the air toxics [sic] compounds detected while above normal ambient concentrations, are well below ATSDR acute minimal risk levels (MRL) and do not pose an immediate health concern." However, CITGO does not quote the remainder of the report. More specifically, the report is in the form of an e-mail from LDEQ's senior environmental scientist, Jim Hazlett. It continues to state that, of the three air cannister samples taken on June 21, 2006, the benzene sample reflected a concentration slightly above the ATSDR acute MRL. Notwithstanding, Mr. Hazlett believed that the benzene would be expected to dissipate within a few days and, therefore, did not present a major health concern.

Mr. Hazlett's e-mail further states that "[a]n MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse noncancer health effects over a specified duration of exposure." It explains that the estimates are intended to *identify* contaminates and potential health effects at a spill site, and it concludes with: "*It is important to note that MRLs are not intended to define clean-up or action levels* for ATSDR or other agencies." (Emphasis added.) The record reveals that the three samples referenced in the e-mail were not taken at the plaintiffs' work site. According to the LDEQ sample readings themselves, their locations were: on the Southwest corner of the

22

intersection of Carlyss Drive and Walker Road; on Highway 1133 between Highway 108 and Clifton Ridge Road; and, one location was left blank. When questioned about LDEQ's monitoring, Mr. Parker responded that the monitoring did not apply to the plaintiffs working at CRC, and he indicated that the cannister method used by LDEQ is limited because the cannister only draws in air directly in front of the cannister's valve at the moment that it is opened.

As to CRC's monitoring results from June 25, 26, and 28, showing thirty-nine pages with columns of zeros and the clocked time of day, Mr. Parker testified that a zero is not a technically appropriate number. Even the lowest reading should reflect an actual number and indicate that the concentration was "less than" whatever the detection level of the instrument was. Mr. Parker further testified that the type of instrument used by CRC was not indicated at all, and there was no back-up data to support the findings. In particular, he had a problem with a zero reading on carbon monoxide (CO) which exists at some level in every environment. Therefore, zero readings are not only the results of inaccurate recordings on forms with no meaningful information, but they also indicated to Mr. Parker that CRC's instruments were not sufficiently sensitive.

Mr. Parker provided an "Industrial Hygiene Sampling Data Sheet" which contains over thirty cells for needed information when reporting sampling results, in order for the sampling to be useful and meaningful. Some examples of the data to be recorded include wind speed, barometer, humidity and temperature readings, employee identification number, job classification, facility address, sample type, sampled by, sample number, instrument identification, calibration date, calibrated by, sample time, flow rate, protective equipment worn, and contaminants.

Mr. Delno Malzahn, an industrial hygienist and meteorologist testifying on behalf of CITGO, admitted that, while he had no personal monitoring data on the plaintiffs, he did have personal monitoring data on individuals working right down in the oil. Under a worst case analysis, he opined that where those individuals in locations with maximum exposure had readings well below the hazardous exposure levels, then the plaintiffs, who were far removed from the maximum exposure areas, could not have suffered significant exposures. Mr. Parker vehemently disagreed with this worst case scenario method, stating that it often happened that the man least likely to have been exposed turned out to be the sickest or most exposed man. Mr. Parker gave an example of workers cleaning out a huge junction box in a refinery; the "hole watch" sitting on top of the hole suffered the highest exposure, while the men inside the box, hydroblasting the residue from the walls, suffered less toxic exposure.

Mr. Malzahn testified on the various sampling devices used by CITGO. While Mr. Malzahn testified that the overall sampling showed a daily decrease in VOCs (volatile organic compounds) as the oil weathered, he admitted that no benzene tests were performed on the first day of the release. When questioned about samples showing higher levels of VOCs on June 22 than on June 21, he said the increase was due to the variability of the wind and the location of the sample. He also testified that a sampling reflected one minute in one spot over an eight hour work-day. This fact tends to support the plaintiffs' position that the various samplings represented one snapshot in time and did not address the plaintiffs' exposures at CRC.

The record also contains evidence that the monitoring by CITGO was limited in its weight value where CITGO's head of corporate safety, Bill Jones, admitted that the geographic area of the spill was large and that monitoring was difficult. He related that CITGO would get complaints of an odor and arrive to take

24

a sample perhaps an hour later, after the odor had disappeared. Mr. Jones also testified that CITGO did not specifically monitor for xylene, toluene, hexane, heptane or any octanes, nonane, ethylbenzene, or trimethylbenzenes.

Additionally, John Grabowski, CITGO's corporate industrial hygienist, could not identify a passive dosimetry badge that was worn in the vicinity of CRC or any personal monitoring that would relate to the workers at CRC. Mr. Malzahn opined that "[t]he appropriate hierarchy for determining occupational health risks begins with personal monitoring," which was not provided for the plaintiffs in this case. Therefore, the eight-hour time-weighted averages and permissible exposure levels cannot be quantified with exactitude as CITGO insists. Moreover, the plaintiffs worked ten hour-shifts and some testified to working weekends at times.

CITGO attempted to show at trial that any benzene in the slop oil would have evaporated in the first few hours, before it ever reached CRC, by introducing an article by Coast Guard Lt. W.D. Eley, et.al., entitled, *Is Overexposure to Benzene Likely During Crude Oil Spill Response?* That article explained that, depending upon the API gravity of the spill, whether it is sunny or cloudy, windy or calm, and whether the waters are open sea or more restricted, the benzene may volatilize slowly from the liquid. The article stated that in restricted waters, "[t]he dense vapor will seek low areas and pocket. Restricted waters create thicker layers of oil, slowing benzene evaporation and prolonging the period for the risk of overexposure." We note that in this case, the release did not occur on open seas, traffic on the river was almost completely halted, the ship channel was closed for twenty-two miles, and CRC was unable to move its barges and vessels for some time. The article also indicated that in December of 1987, OSHA lowered the benzene PEL from 10 parts per million to

1 part per million as a time-weighted average. Mr. Parker opined that there is no safe level of exposure for benzene.

CITGO criticizes Mr. Parker's methodology. However, the trial court denied CITGO's *Daubert* challenge, finding that, while monitoring is one method for establishing exposure, Mr. Parker's reasons and rationale for finding significant exposures in this case satisfied the challenge and would be weighed by the court. With regard to his methodology, Mr. Parker stated that he came up with a range of exposures for the plaintiffs somewhere in the hundreds of parts per million, probably the upper range. He studied the NIOSH IDLH (immediately dangerous to life and health) ratings for all of the chemicals involved and established a range of between 500 to 1,100 parts per million. Mr. Parker stated that he was not offering an absolute, and he indicated a wide margin of error. However, he stated that the IDLH is defined as that level at which one begins to be impaired, and the literature provides a sense of what the concentrations were. Mr. Parker stated that he interviewed the plaintiffs and found consistent evidence of central nervous system (CNS) symptomology, including headaches and lightheadedness. The fact that no one had passed out helped him determine the upper end of the range. He stated that he did not add the IDLH for benzene, *plus* toluene, *plus* xylene, *plus* ethylbenzene, etc, but he looked at all of them and considered them together to determine a range.

In reviewing the literature on the wide spectrum of chemicals, Mr. Parker found that the plaintiffs inhaled the vapors from the slop oil, were exposed to hydrocarbons, and experienced the symptoms as reported in CITGO's MSDS. He consulted the NIOSH Pocket Guide to Chemical Hazards. Our review of that handbook indicates that the IDLH for toluene is 500 parts per million; the IDLH for ethylbenzene is 800 parts per million; the IDLH for xylene is 900 parts per million;

and the IDLH for n-Hexane is 1,100 parts per million, thus confirming Mr. Parker's exposure estimates in terms of IDLH. During his testimony, Mr. Parker also referenced specific, well-known industry textbooks and publications on threshold limit values and industrial hygiene and toxicology.

CITGO cited our decision in *Trent v. PPG Industries, Inc.*, 05-989 (La.App. 3 Cir. 5/10/06), 930 So.2d 324, for the proposition that a plaintiff cannot prove causation without showing chemical exposure at a certain level. However, the *Trent* case is factually distinguishable and fails to support CITGO's position on causation. In *Trent*, there was no event or oil spill migrating to the plaintiffs' work site. Plaintiffs suspected that ammonia was in the ground when they began digging footings for construction of a pipe rack. Evidence indicated that *before* any work commenced on the project, a geophysical analysis of the soil had been done, and thirty-foot borings were conducted by the defendants with no indication of toxic or hazardous substances. Additionally, an excavation permit identified no hazards, and the defendants issued safe work permits each day of the construction project.

In *Trent*, we articulated a clear lack of evidence by the plaintiffs. Based upon those facts, the court in *Trent* granted summary judgment to the defendants on the issue of causation. Conversely, in the present case, the plaintiffs have well-documented evidence of a major spill of slop oil containing not one but numerous toxic chemicals which migrated to and surrounded the plaintiffs' work site at CRC. In fact, the record in this case contains over 30,000 pages and approximately 1,000 exhibits including, but not limited to, CITGO's MSDS, medical reports from physicians, testimony by health experts, epidemiologists, and industrial hygienists. This case does not involve a minor event. Even CITGO's chemical engineer, Harvey Yee, testified that the term "catastrophe" could be used to describe the release.

CITGO Vice-President William Hatch did not dispute that the release was an environmental disaster, calling it a "significant event." The local news media, KPLC, televised interviews with Coast Guard personnel who issued warnings to the public, and with local small business owners located on the affected waterways regarding their loss of business due to the release. Based upon the body of facts in this case surrounding a major release and upon the plaintiffs' evidence of exposure, we do not find the *Trent* case analogous.

The trial court stated that there was disagreement among the experts regarding causation. It is well-settled that the effect and weight to be given expert testimony is within the broad discretion of the trier of fact. *Vaughn v. Progressive Sec. Ins. Co.*, 03-1105 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207. Furthermore, a trial court is not bound by expert testimony; the court has the power to substitute its own judgment and common sense for the conclusion of an expert witness where the evidence as a whole warrants doing so. *Ryan v. Zurich Am. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214. We find no abuse of discretion in the trial court's determination that CITGO's spill of slop oil caused the plaintiffs' injuries.

**Fear of Future Injury**

In addition to general damages in the amount of $5,000.00, the trial court awarded each plaintiff $2,500.00 for "fear of developing disease." CITGO contends that this award was in error, arguing a lack of evidence and arguing that fear of a future injury must be more than speculative or merely possible. CITGO cites *Broussard v. Olin Corp.*, 546 So.2d 1301(La.App. 3 Cir. 1989), where a panel of this court denied recovery for a fear of cancer, finding that Mr. Broussard did not show that cancer can result from phosgene gas poisoning. There, we cited *Berry v. City of Monroe*, 439 So.2d 465 (La.App. 2 Cir.), *writ denied*, 443 So.2d 597 (La.1983), and

we stated that "mere speculation concerning an event cannot provide the basis for an award for anxiety." *Broussard*, 546 So.2d at 1303.

However, in *Broussard*, we also referred to *Anderson v. Welding Testing Laboratory, Inc.*, 304 So.2d 351 (La.1974), which Mr. Broussard had cited as dispositive of the fear of cancer issue. In *Anderson*, the court found that the plaintiff's fear of cancer resulting from a radiation burn to his hand was a compensable residual of the accident because evidence was adduced that cancer *could* result from a radiation burn. In the present case, the plaintiffs' fear of future injury is not based upon the "mere speculation" described in *Broussard*. CITGO's own MSDS indicates that more than one of the chemicals in the slop oil can cause cancer, particularly benzene, a known carcinogen, and the MSDS discusses chronic lung dysfunction, organ and system damage. Therefore, as in *Anderson*, evidence was adduced here that future injury can result from exposure to some of the chemicals at the plaintiffs' work site. *See also*, *Wisner v. Illinois Cent. Gulf R.R.*, 537 So.2d 740 (La.App. 1 Cir. 1988), *writ denied*, 540 So.2d 342 (La.1989) (state trooper could recover for justified fear of cancer; evidence showing an increased risk of cancer indicates that trooper is reasonable in his fear of acquiring cancer and therefore is likely truthful about his fear).

CITGO further cites *Bonnette v. Conoco, Inc.*, 01-2767 (La. 1/28/03), 837 So.2d 1219, which we find inapplicable in the present case. There, multiple plaintiffs purchased dirt excavated by Conoco and spread it on their lawns. The dirt contained pieces of transite, an asbestos-containing material. The Louisiana Supreme Court reversed mental anguish awards ($12,500.00) and fear of future injury awards ($10,000.00) to the plaintiffs, affirming only the awards for property damage. However, the court in *Bonnette* found that the plaintiffs' past medical expenses were

29

for psychiatric examinations, and the court's reasoning for reversal was the lack of physical injury. Conversely, in the present case, the fourteen plaintiffs worked on an island surrounded by toxic oil and wastewater and suffered physical injuries leading them to fear that they could develop injuries in the future.

At trial, Dexter Breaux, a construction supervisor who vomited the first morning that he encountered the oil at CRC, had nausea and shortness of breath for a month, headaches for six months, sinus problems for ten months, and fatigue, testified that he worried when he found out about the benzene in the slop oil. He indicated that he did not know what will happen in ten years as a result of his exposure. He testified that the oil surrounding the island was thick on the water, and everyone was scared and complaining about the strong odor.

Several of the epidemiological studies in the record provide scientific evidence of psychological and physiological sequelae among those who are exposed to chemical spills, including greater levels of depression, anxiety, somatic symptoms, greater environmental worry, lower perceived social support, higher blood pressure, less fluctuation of cortisol levels, and worse mental health.[3]

Dr. Looney, who examined all of the plaintiffs, stated that, "[w]hen you're exposed to volatile organic chemicals of the nature that we believe that these people have been exposed to, you incur some potential liability for trouble in the future." Dr. Levy testified at trial that the plaintiffs expressed concern to him about future health issues arising from their exposure. He further agreed with the last sentence of the Prestige oil spill study stating that individuals with recurrent exposure to oil should undergo "medical surveillance to detect potential clinical disorders in

---

[3] *See* R.M. Bowler et al., *Aftermath of a Chemical Spill: Psychological and Physiological Sequelae*, 15(3) NeuroToxicology 724-730 (1994); H.H. Dayal et al., *Hazardous Chemicals: Psychological Dimensions of the Health Sequelae of a Community Exposure in Texas*, 48 Journal of Epidemiology and Community Health 560-568 (1994); R.A. Lyons, *Acute Health Effects of the Sea Empress Oil Spill*, 53 Journal of Epidemiology and Community Health 306-310 (1999).

the longer term." Accordingly, the plaintiffs had a justified fear of future injury. We find no merit in CITGO's position.

**Allocation of Fault**

In July of 2008, the plaintiffs filed two motions for summary judgment on the issue of comparative fault—one motion addressing the fault of the plaintiffs, and one motion addressing the fault of third parties or non-parties. On September 19, 2008, the trial court entered two separate judgments granting summary judgment on both issues in favor of the plaintiffs and against the defendants, CITGO and R & R Construction. In the judgment addressing the comparative fault of third parties, the trial court stated that it was granting the judgment under La.Code Civ.P. art. 966(E), which states: "A summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case." La.Code Civ.P. art. 966(E). The trial court's judgment addressing third party fault specifically struck CITGO's defense as to third party fault of the plaintiffs' employer, Ron Williams Construction, and of "Calcasieu Refining Company Refinery" (CRC). The other judgment disposed of the issue of the plaintiffs' fault.

Neither judgment was designated as a final judgment, and neither was immediately appealable under La.Code Civ.P. art. 1915. The defendants did not file applications for supervisory writs following the entry of the judgments. The plaintiffs suggest that CITGO has still not appealed the issue of comparative fault, presumably because CITGO did not reference or attach the prior judgments on the issue. However, CITGO did assign as error on appeal the trial court's refusal to hear argument at trial on the issue of comparative fault, and the interlocutory judgments entered by the trial court are in the record. It is well settled in our jurisprudence that,

31

while an interlocutory judgment may not be immediately appealable, it is nevertheless subject to review by an appellate court when a judgment which is appealable is rendered in the case. *Firemen's Pension and Relief Fund for City of Lake Charles v. Boyer*, 420 So.2d 1323 (La.App. 3 Cir. 1982).

Summary judgments are reviewed de novo. Under La.Code Civ.P. art. 966,

> The initial burden of proof to show there is no genuine issue of material fact remains with the movant. *Hutchinson v. Knights of Columbus, Council No. 5747*, 03-1533 (La. 2/20/04), 866 So.2d 228. If the movant has made a prima facie case that the motion should be granted, the burden shifts to the adverse party to produce enough evidence to show that some issues of material fact remain. *Id*. If the non-moving party fails to produce the evidence, the court must grant the motion as a matter of law. *Id*.

*Moreno Properties Two, L.L.C. v. Acadiana Investment Group, L.L.C.*, 09-634 (La.App. 3 Cir. 12/9/09), 25 So.3d 232, 235-36.

In this case, the plaintiffs submitted memoranda in support of their motions for summary judgment on the issues of the plaintiffs' and third party fault and attached the deposition testimony of William Hatch, CITGO's head of operations, who was second in command, nation-wide. Mr. Hatch testified that the release was preventable and that CITGO violated its policies when the skimmers failed to take the oil from the tanks, and when the seventeen feet of water and slop oil in the storm tanks was not drawn down to five and one-half feet as part of CITGO's pre-storm procedure. The plaintiffs also attached the testimony of Matteson Bell, who installed clean-up booms on the water to absorb the oil, and David Hollis, CITGO's environmental manager, who both testified that the material released by CITGO migrated in two directions due to wind, current, and tidal changes, traveling through the Calcasieu River to the plaintiffs' work site at CRC. The wastewater and slop oil

surrounded CRC, which was basically on an island a short distance from CITGO's Refinery and the WWTU. Mr. Bell testified that he did not arrive at the site until the day after the release, at which time he placed booms around the oil.

In addition to this testimony, the plaintiffs attached CITGO's responses to interrogatories regarding what evidence CITGO had that the plaintiffs themselves, or other parties, caused the damages suffered by the plaintiffs. CITGO's responses to interrogatories stated that CITGO was investigating the use of protective equipment by certain plaintiffs responding to the incident and that it may rely on the deposition testimony of the plaintiffs and their coworkers, medical records, and other information. Accordingly, the pleadings, depositions and answers to interrogatories indicate that the plaintiffs made a prima facie case that neither they, nor their employer, Ron Williams Construction, nor the premise owner, CRC, played any part in the release or the ensuing damages.

In order to defeat summary judgment, CITGO then bore the burden of proving the plaintiffs' comparative fault, and the fault of the plaintiffs' employer, Ron Williams Construction, and the fault of the premise owner, CRC. CITGO failed to meet that burden. In opposing the motions for summary judgment, CITGO attached CRC's policy statement that it would provide a safe work environment and would control hazards under its jurisdiction. However, CITGO offered no proof that it had provided MSDS documentation on the contents and dangers of slop oil or that Ron Williams Construction or CRC had any knowledge or control of the hazard caused by CITGO's release.

CITGO also attached portions of depositions of the plaintiffs. Glenn Miller was one of the plaintiffs whose skin blistered and peeled after working in the water. He stated that he worked on the firewater system, digging up the line and

33

adding hydrants to the system. The pump supplying the water for this system pumped straight out of the Calcasieu River. Mr. Miller testified that when the men asked what the odor was, no one knew. Likewise, Jerry Richard Jr. testified that he worked with Glenn Miller on the firewater system, that his hand peeled, and that he had a rash on his feet. He further stated that a CRC safety man told him that the lunch tent was moved away from the water for one day but then moved back. Mr. Richard explained that the workers could not move away from the contaminated water because it surrounded their work-site.

Craig Arabie testified that no one told the men they were in danger, and he did not hear anyone ask for fresh air equipment; the men just thought that the odor was a smell they would have to deal with. Dexter Breaux, the project supervisor with Ron Williams Construction, testified that no one, including CITGO, told them that they were in danger. Bennett Talbot, safety coordinator, testified that the CRC employees were working right alongside them, and they said they had dealt with spills before, and everyone was under the assumption that the problem would go away. Dennis Bankston testified that he was all over the plant tying rebar, that the "whole water was oil slick," and that no one knew anything. He said that the "plant [CRC] knew it wasn't theirs." Jimmy Buckalew testified that he was never aware of anyone calling a shelter in place and that the lunch area *was* their shelter in place.

Accordingly, the testimony of the plaintiffs does nothing to support a finding of fault against the plaintiffs, their employer, Ron Williams Construction, or the premise owner, CRC. Moreover, both CITGO and R & R filed a joint admission of fault in March 2009 for the release of slop oil from CITGO's refinery and agreed to pay for all damages caused by the June 19, 2006 release. We find no error in the

trial court's granting of the plaintiffs' motions for summary judgment on allocation of comparative fault.

## Punitive Damages

CITGO asserts that the trial court erred in awarding punitive damages under the laws of Oklahoma and Texas because Louisiana law governed the plaintiffs' claims and does not permit an award of punitive damages. We disagree. While it is true that punitive damages must be expressly authorized by statute in Louisiana,[4] at least four articles in the Louisiana Civil Code currently provide for punitive damages, and punitive damages in the form of penalties abound in the Insurance Code in the Louisiana Revised Statutes. Louisiana Civil Code art. 2315.3 provides for punitive damages in the instance of child pornography, while La.Civ.Code art. 2315.4 provides for punitive damages when the defendant is driving intoxicated, and La.Civ.Code art. 2315.7 provides for punitive damages in the instance of child molestation.

Additionally and specifically, La.Civ.Code art. 3546, entitled "Punitive Damages," was enacted in 1991 and provides for an award of punitive damages in Louisiana if the state where the defendant is domiciled awards punitive damages for the injury-causing conduct. Article 3546 is located in Book IV, Conflict of Laws, Title VII, Delictual and Quasi-Delictual Obligations. It provides that a Louisiana court can award punitive damages if two of three criteria are met: (1) punitive damages are authorized by the state where the injury-causing conduct occurred; and/or (2) punitive damages are authorized by the state where the injury occurred;

---

[4]Pursuant to a 2005 survey by Professor Michael L. Rustad, Suffolk University Law School, Boston, punitive damages were completely prohibited in only three states, Nebraska, New Hampshire, and Washington, while two states, Louisiana and Massachusetts, allowed punitive damages only when authorized by statute. *See* Michael L. Rustad, *The Closing of Punitive Damages' Iron Cage*, 38 Loy. L.A. L. Rev. 1297 (Spring, 2005).

and/or (3) punitive damages are authorized by the state where the defendant is domiciled.[5]

The trial court found that CITGO was domiciled where its headquarters were located at pertinent times relative to this litigation and that CITGO's injurious conduct occurred at its corporate headquarters where it made budget and management decisions leading to the subject release in 2006. CITGO was headquartered in Tulsa, Oklahoma, in 1994, at the time that the WWTU was built and at the time that corporate decisions were made to delete the third tank, No. 340, from the WWTU project. CITGO moved its headquarters to Houston, Texas, in 2004 and was headquartered there in 2006 when it released over four million gallons of slop oil and seventeen million gallons of wastewater into Louisiana waterways in Calcasieu Parish. Oklahoma awards punitive damages pursuant to 23 Okl.St.Ann. § 9.1, and Texas awards punitive damages pursuant to V.T.C.A., Civil Practice & Remedies Code § 41.003, more fully discussed below.

Thus, the criterion under La.Civ.Code art. 3546, that punitive damages be authorized by the law of the state of domicile *and* by the law of the state of conduct, are met by both Oklahoma and Texas. When a defendant's conduct occurs in more than one state, Comment (d) to La.Civ.Code art. 3546 directs us to La.Civ.Code art. 3543 and its comments, which we will discuss more fully below. With regard to domicile, Comment (d) to Article 3546 directs us to La.Civ.Code arts. 3518 and 3548.

---

[5] La.Civ.Code art. 3546. Punitive damages: "Punitive damages may not be awarded by a court of this state unless authorized: (1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or (2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled."

Louisiana Civil Code Article 3518, entitled "Domicile," provides that "[a] juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue." However, CITGO argues that under La.Civ.Code art. 3548, a juridical person domiciled outside of the state is considered a Louisiana domicile if it transacts business in Louisiana and incurs an obligation in Louisiana. We disagree. Article 3548 specifically provides:

> For the purposes of this Title, *and provided it is appropriate under the principles of Article 3542*, a juridical person that is domiciled outside this state, but which transacts business in this state and incurs a delictual or quasi-delictual obligation arising from activity within this state, shall be treated as a domiciliary of this state.

La.Civ.Code art. 3548 (emphasis added).

Therefore, treating CITGO as a Louisiana domiciliary under La.Civ.Code art. 3548 is *contingent* upon whether it is appropriate under the principles of La.Civ.Code art. 3542, which provides for an interest analysis, as follows:

> Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.

La.Civ.Code art. 3542.

In the present case, CITGO clearly has pertinent contacts with Louisiana because it has a refinery here. However, CITGO, whose parent company is Venezuelan, has refineries in Texas and Illinois as well, and it has chosen to headquarter its American operations in Texas. Under La.Civ.Code art. 3542, and according to CITGO's own policies, the events giving rise to the dispute originated with CITGO's corporate management. CITGO's "Safety, Health, & Environmental Management Policy 80-00" provides that, while all employees and contractors share responsibility for the health, safety, and environmental performance of their organizations, "Executive Management of the Corporation establishes policies, approves standards and goals for performance, and reviews HS&E compliance for all facilities." It further provides that "The Corporate HS&E Department will conduct comprehensive reviews and assessment of facility compliance through verification of field practices to established procedures" and "assessment of the adequacy of and the adherence to the elements of the HS&E management systems."

With regard to the events giving rise to the dispute under Article 3542, the plaintiffs argue that CITGO's corporate management intentionally underbuilt the WWTU in 1994 and caused delays such that construction of the third tank did not begin until 2006, when it was too late. A memo dated August 15, 1992, indicates that Tulsa management came to Lake Charles to review the scope and cost of the WWTU, with the primary focus on modifying the scope of work and reducing the cost. The 1994 project deadline was to be extended. Directives were issued for cost reduction studies expected to take four to six months to complete. Work was to be split between the Cambridge and Tampa offices. Seven items were deleted under the heading of "Wastewater Equipment Eliminated for Cost Reduction." The total cost

reduction was estimated at $35,300,000.00. The fourth item eliminated was "One Stormwater Tank" at a savings of $12,000,000.00.

Shortly after the WWTU became operational, there were near overflow situations and diversion events of wastewater to a surge pond that had been environmentally closed. Lake Charles suggested a recheck on the capacity requirements and was asking for a third tank as early as 1996. Deposition testimony indicates that a third tank was recommended in 2002 by an engineering firm hired to assess WWTU capacity, but budget decisions directed funds elsewhere. The record contains evidence that other multi-million dollar projects were given priority; the projects actually increased the load on the WWTU's existing system and violated some of CITGO's own policies regarding environmental projects.

An interim amount of $2,700,000.00 was approved in May of 2004 for engineering and project design of the capacity upgrade. Another report based upon a 2004 study indicates that corporate management approved the use of an "engineering value center" located in Venezuela. Pursuant to a 2005 e-mail, however, the use of the Venezuelan engineering firm resulted in ineffective communication and problems. Final approval of the remainder of the $14,450,000.00 capacity upgrade was granted in March of 2005. The reasons given for the approval request included three reported permit exceedances in 2002 leading to an LDEQ warning letter in 2003. The reasons acknowledged a total of twelve permit exceedances since the WWTU expansion in 1994 and eight storm events that had pushed the WWTU beyond its capacity since 1999. Construction of the third tank did not begin until the Spring of 2006 and was not completed when the storm event and release occurred on June 19, 2006.

CITGO argues that the WWTU was not intentionally underbuilt, that CITGO's corporate management had nothing to do with the delays that left the third stormwater tank project incomplete in June of 2006, and that decisions on how and when to build the upgrade occurred at CITGO's refinery in Lake Charles, not in Oklahoma and Texas. CITGO argues that these points were "explained by witnesses personally involved in the decisions" and points extensively to the trial testimony of Adolph Lechtenberger, the 1996-1999 plant manager in Lake Charles who had retired from Tulsa management in 2004. Mr. Lechtenberger testified that the design of the WWTU was a "best practice" industry design and that designing a unit for one hundred percent capability could cause other problems, basically resulting in over-design. He further testified that the non-functional skimmers, the oil build-up, and the breach in the dike in 2006, as summarized by CITGO, would have been his responsibility had those events occurred while he was plant manager. However, the trial court specifically indicated in response to this testimony that because of the "temporal issues" and the time frame of his employment as plant manager, Mr. Lechtenberger's testimony regarding management protocol would not be given much weight.

Moreover, under cross-examination, Mr. Lechtenberger testified that he would have given high priority to maintaining the levels in the tanks and assuring that the skimmers worked. He could not explain and did not refute testimony that the skimmers had indeed stopped functioning a couple of years after installation, which would have been while he was the Lake Charles plant manager between 1996 and 1999.

CITGO further pointed to the testimony of CITGO capital budget manager in Houston, Cresha Sivinski, who testified that from a budgeting standpoint,

corporate did not get into the execution of the refinery projects. However, she also testified that corporate did at one time require that forty percent of the engineering on major projects be done by Venezuelan contractors. The trial court heard and weighed over 5,000 pages of trial testimony in this case and determined that CITGO was domiciled in Texas and Oklahoma, and the injurious conduct occurred there under La.Civ.Code arts. 3546 and 3542.

Under its interest analysis argument, CITGO cites thirty-year-old cases for the propositions that Louisiana has had an unswerving interest in rejecting punitive damages and protecting defendants like CITGO who do business in Louisiana. *See Commercial Union Ins. Co. v. Upjohn Co*., 409 F.Supp. 453 (E.D.La. 1976) and *Karavokiros v. Ind. Motor Bus Co*., 524 F.Supp. 385 (E.D.La. 1981), respectively. CITGO paints with too broad a brush and too heavy a hand. Louisiana does not have a policy of protecting all out of state defendants from their own state's laws. Nor does Louisiana have an unswerving interest in rejecting *all* punitive damages, as indicated by the statutes discussed.

In 1984, subsequent to *Upjohn* and *Karavokiros*, Louisiana enacted a specific statute which provided for the assessment of punitive damages against a tortfeasor for injuries caused by wanton or reckless disregard of public safety in the storage, handling, or transportation of hazardous or toxic substances. This provision had been added by Acts 1984, No. 335, § 1 as La.Civ.Code. art. 2315.1, was redesignated as La.Civ.Code art. 2315.3 in 1986, amended by Acts 1990, No. 302, § 1, and it was repealed by Acts 1996, 1st Executive Session, No. 2, § 1, effective April 16, 1996. CITGO argues that the repeal in 1996 of then article 2315.3 was based upon a legislative intent to allow criminal statutes to regulate the handling of toxic substances, "thus negating the need for exemplary damages which serve only to

41

punish." However, La.Civ.Code art. 2315.3 and its precursor were in Book III of our Civil Code, under Modes of Acquiring Ownership of Things, Title V, Obligations Arising Without Agreement. In this case, the issue is punitive damages in the context of a conflict of law analysis, and the specific punitive damage statute, La.Civ.Code art. 3546, was enacted in 1991, was not repealed, and must be considered in the framework of the conflict of law statutes in Book IV, Conflict of Laws, Title VII, Delictual and Quasi-Delictual Obligations.

Under the interest analysis test, La.Civ.Code art. 3542 requires that a court also evaluate the strength of the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts. Louisiana Civil Code article 3515 is the general and residual rule for determining the applicable law, and it provides that the choice of law state

> is determined by evaluating the strength and pertinence of the relevant policies of *all involved states* in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La.Civ.Code art. 3515 (emphasis added).

When the conduct and injury occur in different states and pertain specifically to issues of conduct and safety, as opposed to financial protection, we must consider the law of the state which provides for a higher standard of conduct. In this case, the states awarding punitive damages for negligent conduct have higher standards of conduct than states not awarding punitive damages for the same conduct.

42

More specifically, La.Civ.Code art. 3543 provides in pertinent part:

**Art. 3543. Issues of conduct and safety**

Issues pertaining to standards of conduct and safety are *governed by the law of the state in which the conduct* that caused the injury *occurred, if the injury occurred* in that state or *in another state whose law did not provide for a higher standard of conduct.*

Accordingly, the injuries in this case occurred in Louisiana, a state whose law does *not provide* for a higher standard of conduct. Therefore, the issues in this case are governed by the law of the state where the injurious conduct occurred.

The comments to La.Civ.Code art. 3543 explain why Louisiana does not have the greater interest in this case, and they provide a method for determining which state's law should apply, Texas or Oklahoma:

(f) Conduct and injury in different states: Application of the law of the state of conduct. The first paragraph of this Article provides that, if the injurious conduct and the resulting injury occur in different states, the law of the state of conduct applies, if the law of the state of injury "did not provide for a higher standard of conduct: than the state of conduct. Phrased affirmatively, this means that the law of the state of conduct applies if it provides for the same or a higher standard of conduct than does the state of injury. Indeed, *when the standards prescribed by the two states are the same, there is no actual conflict and the application of the law of the state of conduct need not be explained or defended.* When the law of the state of conduct provides for a higher standard of conduct than does the law of the state of injury, the *application of the law of the state of conduct* may be *justified both in terms of the interest of the two states and from the perspective of the individuals involved.* In terms of the interests of the two states, *applying the law of the state of conduct* when that state imposes the higher standard *promotes the policy of that state in policing conduct and preserving safety within its borders, without subordinating whatever policies may be embodied in the law of the state of injury* which allows a lower standard of conduct. *The effectiveness of the conduct-regulating law of the state of conduct would be seriously impaired if exceptions to it were made for out-of-state injuries. Such exceptions are not warranted by the fact that the state of*

43

*injury happens to allow a lower standard of conduct, since such a lower standard is designed to protect conduct within, not without, that state. Finally, from the perspective of the individuals involved, there is nothing unfair about subjecting a tortfeasor to the law of the state in which he acted. Having violated the standards of conduct of that state, he should bear the consequences of such violation and should not be allowed to invoke the lower standards of another state.* See Symeonides, "Choice of Law for Torts," 445-46 and authorities cited therein.

La.Civ.Code art. 3543, Comment (f) (emphasis added).

Comment (e) provides that, "[w]hen the law of the state of conduct is the one prescribing the higher standard, this Article authorizes the application of that law *without any qualifications*, *but subject always to the escape clause of Article 3547*."

La.Civ.Code art. 3543, Comment (e) (emphasis added).

The comments to article 3543 further provide:

(h) Conduct in more than one state. *Cases in which the injurious conduct occurs in more than one state should be approached under the principles of causation* of the law of the forum. Ordinarily, these principles will make it possible to determine which particular conduct was, legally speaking, the principal cause of the injury. Following such a determination, the case will be governed by either the law of the state of that conduct or the law of the state of injury, depending on which paragraph of this Article is applicable, and subject always to the "escape clause" of Article 3547, infra. In the latter case, as well as in all cases in which the principles of causation would not yield a clear answer, the applicable law will be determined in accordance with Article 3542. *It is also possible that the fact that the injurious conduct was not localized in any single state could, in appropriate circumstances, evoke the escape clause of Article 3547, even without resorting to the principles of causation.*

La.Civ.Code art. 3543, Comment (h) (emphasis added).

In this case, the trial court found La.Civ.Code art. 3547 applicable in the alternative, but did not determine which state's law applied, Texas or Oklahoma. The article provides:

**Art. 3547. Exceptional cases**

> The law applicable under Articles 3543-3546 shall not apply if, from the totality of the circumstances of an exceptional case, it is clearly evident under the principles of Article 3542, that the policies of another state would be more seriously impaired if its law were not applied to the particular issue. In such event, the law of the other state shall apply.

We will apply the punitive damage law of Texas because it is appropriate under articles 3515, 3518, 3542, 3543, 3546, and it is not inappropriate under article 3547, to which many of the articles are subject. More specifically, we find that Oklahoma and Texas both have punitive damage laws; therefore, there is no true conflict as to those states, and the conflict analysis does not have to be defended as to one over the other, pursuant to article 3543. Notwithstanding, under the interest analysis of article 3542, and under article 3546, Texas is the current domicile of CITGO and likely has a greater interest in enforcing its punitive damage law in this case than does Oklahoma. Under the legal cause analysis of article 3543, while causation occurred in both states, but for the release in 2006, the damages to the plaintiffs would not have occurred. Therefore, the legal cause of the injuries indicates CITGO's Texas domicile.

## Punitive Damages; Burden of Proof

The trial court awarded punitive damages based upon the seriousness of the spill, the trial court's previous ruling on fraud, CITGO's failure to warn the local populace of its existing MSDS on the spilled product, and upon CITGO's having cognizantly misinformed government agencies of the status and capabilities of its WWTU. Each plaintiff received $30,000.00 in punitive damages, and no plaintiff received a total award exceeding $50,000.00 due to the jurisdictional limits for a bench trial.

45

The standards for recovery of exemplary damages in Texas are: (1) fraud; (2) malice; or, (3) gross negligence. The plaintiffs must prove punitive damages by clear and convincing evidence. V.T.C.A., Civil Practice & Remedies Code § 41.003. Punitive damages are capped at: (a) two times the compensatory damages plus an amount equal to non-economic damages, not to exceed $750,000; *or* (b) $200,000, whichever is greater. V.T.C.A., Civil Practice & Remedies Code § 41.008.

In Texas, under V.T.C.A., Civil Practice & Remedies Code § 41.001 (6), "'Fraud' means fraud other than constructive fraud." CITGO contends that the trial court's reference, in its written reasons, to its prior finding of civil fraud is improper because that was a finding made as part of a discovery hearing which was not part of the trial record. The plaintiffs argue that the fraud finding referenced by the trial court occurred in a pre-trial hearing where the crime/fraud exclusion to the attorney-client privilege vitiated CITGO's prior efforts to exclude evidence. They argue that the trial court's adoption of other written reasons is certainly permissible. The plaintiffs further argue that CITGO twice filed applications for writs on the issue, that this appellate court twice declined to exercise its authority for supervisory review, and that the Supreme Court eventually denied writs as well. However, the plaintiffs do not attach the writ denials or the trial court's judgment on fraud and privilege, and they do not appear to be in the record.

The record does contain the supreme court's May 2009 remand of the issue back to the trial court for a more complete ruling after taking briefs and performing an *in camera* inspection of the documents. The record also contains the trial court's July 2009 written reasons and order, indicating his review and inspection, and again indicating his finding of fraud, and listing the excluded documents. The

46

record further contains CITGO's July 30, 2009 request for a stay indicating an intent to file a second writ application with this court, but the trail appears to end there.

While this court does have access to its own prior rulings, neither the issue of fraud, nor the prior rulings on fraud are on appeal by CITGO. Moreover, as stated, there appears to be no judgment in the record on fraud. The October 22, 2009 judgment being appealed by CITGO does not mention or address fraud in any way. Accordingly, the issue of fraud is not properly before us, and we will pretermit the issue of fraud with regard to Texas punitive damage law.

Under V.T.C.A., Civil Practice & Remedies Code § 41.001(7), "'Malice' means a specific intent by the defendant to cause substantial injury or harm to the claimant." While the plaintiffs have charged CITGO with "intentionally" underbuilding the WWTU in its original design in 1994, and with misinformation, and with changing its MSDS in December 2006 after the June 2006 release, the record does not support a specific intent to cause substantial harm to the plaintiffs under Texas law on malice.

However, we do find that the record supports the punitive damages awarded by the trial court under the gross negligence law of the Texas punitive damages statutes. In Texas, gross negligence involves two components: (1) viewed objectively from the actor's standpoint, the act or omission complained of must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and, (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. V.T.C.A. Civil Practice & Remedies Code § 41:001(11); *Bennett v. Reynolds*, 315 S.W.3d 867 (Tex. 2010); *Transportation Insurance Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994).

47

The first element, *extreme risk*, does not mean a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff. *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917 (Tex. 1998); *Universal Servs. Co. v. Ung,* 904 S.W.2d 638 (Tex. 1995); *Moriel,* 879 S.W.2d 10. The second element, *actual awareness*, means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care. *Ellender,* 968 S.W.2d 917; *Wal-Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322 (Tex. 1993). Circumstantial evidence is sufficient to prove either element. *Ellender,* 968 S.W.2d 917; *Moriel,* 879 S.W.2d 10.

"Evidence of gross negligence is legally sufficient if, considered as a whole in the light most favorable to the prevailing party, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 595 (Tex. 1999). Some evidence of simple negligence is not evidence of gross negligence. *Id.*; *Ellender*, 968 S.W.2d 917; *Ung,* 904 S.W.2d 638; *Moriel,* 879 S.W.2d 10. Conversely, some evidence of care does not defeat a finding of gross-negligence. *Sanchez,* 997 S.W.2d 584.

In the present case, CITGO's corporate management had the responsibility of establishing its standards and performance goals, and for reviewing, approving, and assuring adherence to established health, safety, and environmental compliance. It had knowledge and was constantly aware of the problems with the WWTU but made decisions and enforced policies regarding engineering and construction that resulted in the ultimate release of millions of gallons of toxic oil and wastewater into the Calcasieu waterways, causing injuries and damages to the plaintiffs. The detailed and voluminous analyses in Parts II and III of this opinion clearly support a finding of gross negligence by CITGO.

IV.

**CONCLUSION**

Accordingly, based upon the foregoing, we affirm the October 22, 2009 judgment of the trial court with regard to causation and with regard to the awards of damages for fear of future injury and punitive damages. While we agree that the trial court should have clarified whether Texas or Oklahoma law should be applied when it recorded its written reasons, and that it should have provided further legal analysis in that regard, the trial court's results were supported by the record.

For the reasons given, we further affirm the trial court's judgments of September 19, 2008, on allocation of fault. We also affirm the trial court's assessment of costs to the defendant, CITGO Petroleum Corporation. Likewise, the costs of this appeal are assessed to CITGO.

**AFFIRMED.**