# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 13-236 C/W

**ALNEDIA ANTHONY, ET AL.**

**VERSUS**

**GEORGIA GULF LAKE CHARLES, LLC**

### 13-638 C/W

**MAURICE PAUL BILLIOT, ET AL.**

**VERSUS**

**GEORGIA GULF LAKE CHARLES, LLC**

### 13-778, 13-779, 13-780, 13-781, 13-782,13-783, 13-784, 13-785, 13-786, 13-787, 13-788

**TANGELA BROWN, ET AL.**

**VERSUS**

**GEORGIA GULF LAKE CHARLES, LLC**

\*\*\*\*\*\*\*\*\*\*
**APPEALS FROM THE FOURTEENTH JUDICIAL
DISTRICT COURT, PARISH OF CALCASIEU
DOCKET NOS. 2007-5073-E (*ANTHONY*); 2007-5082-A (*BILLIOT*);
2007-5068, 2007-5074, 2007-5078, 2007-5120, 2007-5142,
2007-5189, 2007-5201, 2007-5206, 2007-5213, 2007-5219
AND 2007-5264 (*BROWN, ET AL.*)
HONORABLE DAVID RITCHIE (*ANTHONY*), HONORABLE
D. KENT SAVOIE (*BILLIOT*), AND HONORABLE CLAYTON DAVIS
(*BROWN, ET AL.*), PRESIDING**
\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, J. David Painter and Shannon J. Gremillion, Judges.

**AFFIRMED.**

Wells T. Watson
Baggett, McCall, Burgess, Watson & Gaughan
3006 Country Club Road
P.O. Drawer 7820
Lake Charles, LA  70605-7820
(337) 478-8888
**ATTORNEY FOR PLAINTIFFS/APPELLEES**
  Alnedia Anthony, et al.; Maurice Paul Billiot, et al.; and Tangela Brown, et al.

Louis C. LaCour, Jr.
Raymond P. Ward
Adams and Reese LLP
701 Poydras Street, Suite 4500
New Orleans, LA  70139
(504) 581-3234
**ATTORNEY FOR DEFENDANT/APPELLANT**
   Georgia Gulf Lake Charles, LLC

Ernest P. Geiger, Jr.
John E. W. Baay, II
William A. Barousse
Geiger, Laborde & Laperouse, L.L.C.
701 Poydras Street, Suite 4800
New Orleans, LA  70139-4800
(504) 561-0400
**ATTORNEY FOR DEFENDANT/APPELLANT**
   Georgia Gulf Lake Charles, LLC

**COOKS, Judge.**

This matter involves three consolidated appeals from three separate final judgments in related cases, arising from the same accident. The plaintiffs in the three consolidated appeals are persons asserting injuries caused by exposure to smoke and chemicals from an explosion and fire at Defendant's plant. Defendant has not denied liability for the cause of the explosion and fire, but denies the plaintiffs' claims of exposure to unsafe levels of hazardous chemicals. Varying amounts of damages were awarded to the plaintiffs. Defendant appeals, alleging the plaintiffs failed to prove exposure to any substance in sufficient quantities to cause any compensable damages and in the alternative that the damages awarded to many of the plaintiffs were excessive.

### FACTS AND PROCEDURAL HISTORY

On September 17, 2006, an explosion and fire occurred at Georgia Gulf Lake Charles' Westlake facility. One of the results of the fire was a "catastrophic release" of several hazardous chemicals. Due to the release of the chemicals, Georgia Gulf was forced to call a "shelter in place" for the nearby community.

Numerous suits were filed against Georgia Gulf by persons living or present in the community on the night of the explosion and fire. Georgia Gulf stipulated it was at fault in causing the incident, but reserved its right to contest causation (both general and specific) and the amount of damages due. In the summer of 2011, the first case to proceed to the merits was *Tangela Annette Brown, et al. v. Georgia Gulf Lake Charles, LLC*, docket number 2007-5068, and was presided over by Judge Clayton Davis of the Fourteenth Judicial District Court. That case resulted in a favorable ruling for the plaintiffs. This court in *Brown v. Georgia Gulf Lake Charles, LLC*, 12-635 (La.App. 3 Cir. 12/5/12), 104 So.3d 730 (hereafter referred to as *Brown 1*), affirmed the lower court judgment and rejected Georgia Gulf's arguments concerning causation and the severity of the plaintiffs' exposure to the

3

hazardous chemicals. This court accepted the findings of the trial court on those issues and concluded the trial court's determination "that the fire and chemical release caused the symptoms suffered by plaintiffs is reasonable." *Id.* at 733.

Three additional trials were held in 2012 with similarly situated plaintiffs as in the *Brown I* case. These cases were as follows: *Alnedia Anthony, et al. v. Georgia Gulf Lake Charles, LLC*, docket number 2007-5073 (hereafter referred to as *Anthony*), presided over by Judge David Ritchie; *Maurice Paul Billiot, et al. v. Georgia Gulf Lake Charles, LLC*, docket number 2007-5082 (hereafter referred to as *Billiot*), presided over by Judge D. Kent Savoie; and *Tangela Annette Brown, et al. v. Georgia Gulf Lake Charles, LLC*, docket numbers 2007-5068, 2007-5074, 2007-5078, 2007-5120, 2007-5124, 2007-5189, 2007-5201, 2007-5206, 2007-5213, 2007-5219 and 2007-5264, (hereafter referred to as *Brown II*), presided over by Judge Clayton Davis.[1]  As in *Brown I*, Georgia Gulf stipulated it was at fault in causing the incident but reserved its right to contest the causation issue and the amount of damages due. The plaintiffs presented the testimony of numerous experts, including an industrial hygiene expert, an environmental chemist and toxicologist, an occupational medicine physician and epidemiologist, and several treating physicians. These experts and physicians testified that the plaintiffs were exposed above the levels prescribed by the federal government as safe. The plaintiffs' experts specifically testified the plaintiffs were exposed to extremely toxic chemicals that were released as a result of the explosion and fire, including hydrochloric acid, ethylene dichloride and vinyl chloride. The plaintiffs' experts also testified regarding the multiple hazardous health consequences reasonably expected to result from exposure to these chemicals, including cancer. It was also

---

[1]     *Brown II* involved submission of the prior record in *Brown I* and the introduction of all relevant expert reports.

4

established that the "shelter in place" called by Georgia Gulf included the areas where the plaintiffs were located on that evening.

All three judges of the Fouteenth Judicial District Court found plaintiffs met their burden of proving causation and injurious exposure. In all three cases, varying damage awards were made to the individual plaintiffs. Georgia Gulf has appealed all three judgments, and this court, on Georgia Gulf's motion, consolidated the three appeals. Georgia Gulf asserts the following assignments of error:

1. The trial courts erred in finding plaintiffs met their burden of proving causation.

2. The trial courts' damage awards are excessive.

## ANALYSIS

### I. Causation.

In its first assignment of error, Georgia Gulf contends the plaintiffs failed to carry their burden of proving causation. This court in *Brown I*, 104 So.3d at 732-33, was presented with the same arguments on the causation issue and set forth the applicable standard of review:

> A cause is a legal cause in fact if it has a proximate relation to the harm which occurs. *Butler v. Baber*, 529 So.2d 374 (La.1988). "A proximate cause is generally defined as any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred." *Sutton v. Duplessis*, 584 So.2d 362, 365 (La.App. 4 Cir.1991). If there is more than one cause of injury, "a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm." *Rando v. Anco Insulations, Inc.*, 08-1163, 08-1169, p. 31 (La.5/22/09), 16 So.3d 1065, 1088. Causation is an issue of fact subject to the manifest error standard of review. *Id*.

> *Hutto v. McNeil-PPC, Inc.*, 11-609, pp. 17-18 (La.App. 3 Cir. 12/7/11), 79 So.3d 1199, 1213, *writ denied*, 12-402 (La.4/27/12), 86 So.3d 628, *cert. denied*, ___ U.S. ___, 133 S.Ct. 428, 184 L.Ed.2d 289 (2012).

5

The trial court's factual findings may not be reversed unless there is no reasonable basis for the finding in the record and the finding is manifestly erroneous.

> "Factual determinations of the trier of fact may not be reversed absent manifest error or unless they are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). In order to reverse a trial court's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. *Stobart v. State, Department of Transportation and Development*, 617 So.2d 880, 882 (La.1993). The appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221."

> *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 p. 11 (La.4/3/02), 816 So.2d 270, 278-279.

*Green v. K-Mart Corp.*, 03-2495, pp. 3-4 (La.5/25/04), 874 So.2d 838, 841-42.

Georgia Gulf argues "[t]here is no proof in this case, testimonial or otherwise, that any particular plaintiff was, *in fact*, exposed to any particular chemical, for any particular period of time, at any particular concentration (dose) from the Georgia Gulf site." Georgia Gulf asserts the respective trial courts were "persuaded" to "equate the *possibility* of exposure with proof of *actual* exposure." Georgia Gulf maintains this error on the part of the respective trial courts requires we conduct an independent, de novo review of the record. We disagree and find no error in the trial courts' findings that the plaintiffs satisfied their burden of proving causation.

We note all three of the trial judges that examined the evidence in these cases, clearly found causation and moreover found Georgia Gulf's behavior throughout this incident revealed a lack of candor in its monitoring and in the

information it relayed to the public. Judge Davis in *Brown I* gave thorough oral reasons for his finding of causation, which this court quoted with approval:

> I find that the plaintiffs satisfied the burden of proof by a preponderance of the evidence through the eyewitnesses of the--dozen or so eyewitnesses who testified that they were exposed by smell, taste, visual, and because of, in some cases, the immediate effects reactions to their exposures supports the finding of an exposure to these plaintiffs.
>
> I find that the release exceeded Georgia Gulf's estimate in both the volume released and the duration. The evidence was compelling that the release of chemicals began before the fire started and continued beyond the time the fire was extinguished. The estimate was low, because the release began earlier than they were willing to admit and continued later, but also because the--we had that issue of the--I think it was the ESC feed line that could be shut down and that issue was presented in kind of a vague way at first through Butterworth's testimony and sought to be clarified by Dr. Murphy or Haussmann--I think it was Haussmann but even then, when we finally got to the point that the--this was a system shutdown that had to be initiated by operators, and we really didn't have any record of—didn't have any record of when that system was shut down. We simply had information relayed to the expert that it was--there was immediate isolation but nothing to support that. And I would have to believe that in a facility like this, you have documents, such as the monitoring data, that would tell you what was happening on a line such as this. So the release exceeded the estimate.
>
> The release, even based on the numbers admitted to by Georgia Gulf was enormous. We're talking about 43,000 pounds of HCL [ ] versus an exposure to people that are calculated in parts per million so it's not hard to--you know, unless I want to simply reject out of hand the dozen or so eyewitnesses who testified about the exposure and accept experts, primarily Dr. Murphy who presented a super, which may well have dealt with a large amount of the release--I mean, it may well have modeled the--the direction of a good bit of the release but not a hundred percent. And this was a toxic mix of chemicals. That's undisputed. The mix is more potent than any individual chemical. I don't believe that was even disputed. But, obviously, the model had problems, because there were specific readings in the DEQ monitor and the 4.2 ppm at the ferry that were known and not really picked up in the model.
>
> . . . The turbulence created by the fire and I watched the video--dispersed the chemicals in all directions, and that's proven again by the onsite monitoring locations which picked up chemicals in all directions. And then there were--we also had the Moss Bluff cloud that was called in that tells you that chemical went to that northeast direction.

I accept the testimony of the plaintiffs' experts as to the amounts, but all of that is imprecise to some degree, because, again, you have a mix, but you can't deny the exposure because of what eyewitnesses testified to.

. . . .

[C]learly, there were sufficient concentrations [of toxic chemicals] to cause effects on people in the community. And that's the finding of the Court.

*Brown,* 104 So.3d at 733-34 (first alteration in original).

Similarly, Judge Ritchie in *Anthony*, in written reasons for judgment, found the plaintiffs established exposure and causation by a preponderance of the evidence. He also noted the difficulty Georgia Gulf's post-explosion behavior had on the plaintiffs' ability to accurately assess the amount of chemical exposure each plaintiff suffered. He wrote:

1) Georgia Gulf made a deliberate and/or grossly negligent decision prior to, during and after, the explosion and resulting fire, to make sure there was minimal, if any, air monitoring outside of the plant in the most populated and heavily traveled areas closest to the Georgia Gulf plant, which made it impossible for Plaintiffs, or anyone else, to determine the amount of the multiple hazardous chemicals to which the public may have been exposed. The only air monitoring performed off-site by Georgia Gulf was away from the more populated areas, which was performed by untrained employees, who, in spite of their lack of training, obtained readings that were indicative of a high level of chemicals in the air. 2) That Georgia Gulf violated its own policies with regard to the lifting of the Shelter in Place. 3) That Georgia Gulf's reliance on the testimony of Dan Chapman of the Louisiana Department of Environmental Quality and Sgt. John Porter of the Louisiana State Police to support Georgia Gulf's position that no one, including the Plaintiffs, could have been exposed to the hazardous chemicals released in the explosion and fire, is not supported by the evidence in this case, including the testimony of other credible citizens, even though they may be clients of Plaintiffs' counsel. To be clear, the Court is not making a finding that Mr. Chapman and Sgt. Porter are not credible, but there is other credible evidence to show that the hazardous chemicals released by Georgia Gulf were in the air outside of the plant, including the few air monitoring results obtained by Georgia Gulf. In support of its case, Georgia Gulf takes the position that, even with the on-site monitors showing levels of hazardous chemicals in the air that were many times what would be considered a safe level, it allowed many employees and on-site responders to be present without any protective gear, which would be a clear violation of Georgia Gulf's own safety policies and procedures. The fact that Georgia Gulf violated its own

policies and put its employees and responders at risk is not impressive or persuasive to this Court. (4) The Plaintiffs in this group of cases each had some pre-existing health problems that would make some of them more susceptible to injury as a result of exposure to hazardous chemicals from the Georgia Gulf release/explosion/fire.

Lastly, Judge Savoie in *Billiot* also found the plaintiffs met their burden of proving causation, orally finding as follows:

> I am satisfied that based on the testimony that more likely than not every one of these plaintiffs was exposed to harmful chemicals that were released before, during, and after the Georgia Gulf explosion that occurred on September the 17th at approximately 7:28 p.m., 7:26, maybe. And I tried to come up with a way to quantify what their damages are.
>
> Let me first comment about the expert witnesses that I heard. Dr. Looney, although his testimony was tedious and difficult to listen to, I firmly believe that he had the best interests of his patients at heart, was very honest and straightforward with what his comments were; and I trust his opinions, that each one of these plaintiffs sustained injury as a result of the exposure and as to his length of time that he gives for them.

The test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more reasonable than not that the subsequent injuries were caused by the accident. *Lasha v. Olin Corp.*, 625 So.2d 1002 (La.1993). Plaintiffs presented the testimony of numerous experts who identified the various chemicals involved, identified the areas of exposure, analyzed monitoring levels and uniformly opined that the exposures to the various chemicals exceeded the levels considered safe.

Dr. Rod O'Connor testified the turbulence of the fire would have dispersed the chemicals in all directions. It was his opinion that the levels in the pertinent, surrounding zones exceeded safe levels and would likely result in injuries based upon the relevant exposure standards set forth by the Environmental Protection Agency. Plaintiffs note Dr. O'Connor's opinion is supported by Georgia Gulf's in-plant monitoring results which were high and obtained in all different directions from the furnace. Judge Davis, who presided over the *Brown I and II* cases,

9

specifically stated that the turbulence created by the fire was demonstrated in the video, with chemicals dispersing in all directions.

Plaintiffs presented the testimony of industrial hygiene exposure expert Frank Parker, who stated his opinion that the plaintiffs were exposed to a multitude of highly hazardous chemicals. This exposure exceeded the levels set forth as safe for both workers and the community by the federal government. Mr. Parker classified the explosion and fire as a "huge" event that had the "potential' for "putting people in the hospital and killing people."

Dr. Barry Levy testified for plaintiffs as an expert in occupational medicine and epidemiology. This court in *Arabie v. CITGO Petroleum Corp.*, 10-244, p. 7 (La.App. 3 Cir. 10/27/10), 49 So.3d 529, 537, *writ granted*, 10-2605 (La. 2/4/11), 56 So.3d 981, *aff'd in part, rev'd in part*, 10-2605 (La. 3/13/12), 89 So.3d 307, noted that Dr. Levy possessed "impeccable academic and experiential credentials and has received numerous awards from professional organizations for his contributions to public, occupational, and environmental health." Dr. Levy found the exposure the plaintiffs endured was sufficient to cause the injuries claimed and expressly found causation based on a reasonable medical probability. Dr. Levy testified as to several epidemiology studies which examined the effects of exposure to hazardous chemicals. Dr. Levy specifically addressed one study that involved exposure to hydrogen chloride released into a community. Similar to this case, the precise amount of that chemical released into the community was not known, but there were clear, statistically significant health problems in the exposed residents that mirrored the type of health problems suffered by the plaintiffs here. Importantly, the exposed residents in the aforementioned study were still having problems twenty months after the exposure.

Plaintiffs also presented the testimony of several local examining physicians. Dr. Robert Looney, who was a former plant doctor at PPG, was experienced in

10

treating patients exposed to toxic chemicals. Dr. Looney was one of the treating physicians accepted by this court in *Arabie*. Dr. Gerald Mouton also testified, and was experienced in treating patients suffering from chemical exposure. Those doctors, and several others, were of the opinion that the plaintiffs' symptoms were consistent with exposure to the toxic chemicals released following the explosion and fire at the Georgia Gulf facility.

Essentially, Georgia Gulf makes the same arguments and presents the same expert testimony to this court that was made to three different divisions of the Fourteenth Judicial District Court, in the hopes we will substitute our judgment (in the event it were in accord with Georgia Gulf's) for that of the respective trial judges. This we cannot do as an appellate court. Our review of the record reveals a reasonable basis for the findings of the respective trial courts that the chemical release from the Georgia Gulf facility caused the symptoms suffered by the plaintiffs. Thus, we affirm the judgment of all three trial judges that the plaintiffs met their burden of proving causation.

## II.    *Damages.*

Georgia Gulf has also assigned as error the excessiveness of most of the damage awards made by the respective trial courts in the three cases below. At issue are forty-one (41) separate awards of damages to forty-one (41) separate plaintiffs. Georgia Gulf has argued on appeal that *each* of these awards is excessive.

Before addressing the awards individually, Georgia Gulf makes a general argument that the awards appealed from are greatly disproportionate to awards in similar cases. It cites two Louisiana Supreme Court cases, *Howard v. Union Carbide Corp.*, 09-2750 (La. 10/19/10), 50 So.3d 1251, and *Arabie*, 89 So.3d 307.[2]

---

[2]    We note the supreme court's opinion in *Arabie* did not address the individual damage awards discussed by this court in our opinion in *Arabie*. It did discuss whether the plaintiffs in *Arabie* were entitled to recover for fear of possibly contracting cancer (it found the plaintiffs

Both those cases involved plaintiffs who claimed they suffered injuries due to chemical exposure and resulted, generally, in lower awards than those appealed herein.

We find the facts in *Howard* clearly distinguishable from those in this case, as the chemical the plaintiffs in *Howard* were exposed to was naphtha, a single relatively benign chemical. Furthermore, the plaintiffs in *Howard* did not seek, nor require, medical treatment as a result of the exposure. The *Howard* court specifically distinguished that case from *In re New Orleans Train Car Leakage Fire Litigation*, 00-1919 (La.App. 4 Cir. 4/20/05), 903 So.2d 9, *writ denied*, 05-1297 (La. 2/3/06), 922 So.2d 1171, where substantially higher general damages were awarded, finding, as opposed to the facts in *Howard*, that case "involved a potential carcinogen." *Howard*, 50 So.3d at 1256, fn. 4. Thus, we find *Howard* inapplicable to the present case.

We also find Georgia Gulf's reliance on *Arabie* misplaced. There was a wide range of awards made in that case, with some reaching the maximum amount allowed in that case, and others lower than many in the present case. This court specifically found several of the lower awards to be "abusively low" and found many others to be "somewhat low." Despite finding many of the awards to be on the low side, this court did not disturb them because of the discretion a trial court has in rendering damage awards. Thus, *Arabie* is an example of the trial court's vast discretion in matters of damage awards and supports the awards rendered in the present case.

In awarding general damages, it is well settled the trier of fact is afforded great discretion. La.Civ.Code art. 2324.1; *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). An

were entitled to such damages), but it did not address the individual awards made to any plaintiff in *Arabie*. The opinion from this court in *Arabie*, 49 So.3d 529, did discuss the amount of several of the general damage awards rendered.

12

appellate court may only disturb a general damages award after an articulated examination of the facts discloses a clear abuse of discretion. *Miller v. LAMMICO*, 07-1352 (La. 1/16/08), 973 So.2d 693. While reasonable persons frequently can disagree with the quantum of general damages, the monetary award must have a reasonable relationship to the elements of proven damages. Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

**A.      The *Billiot* Awards.**

Georgia Gulf appeals the damages awards to the sixteen individual plaintiffs in *Billiot*. The general damages awards for those plaintiffs ranged from $18,500 to $40,500. Each plaintiff in *Billiot* was also awarded $7,500 in damages for mental anguish.

Initially, Georgia Gulf argues the trial judge in *Billiot* used flawed methodologies to arrive at the general damages awards. Specifically, Georgia Gulf argues the trial court "abused its discretion in assessing damages by employing a mathematical formula, calculating damages solely on duration of symptoms." Georgia Gulf asserts it was the responsibility of the trial court to tailor the damage awards in each case to fit the specific facts of this case, and not to use a "cookie-cutter" approach in fashioning the awards. This flawed methodology, according to Georgia Gulf, requires that we review the awards de novo. We disagree.

We are mindful that our supreme court has on occasion disapproved the use of formulas in arriving at damage awards. See *McFarland v. Illinois Cent. R.R. Co.*, 241 La. 15, 127 So.2d 183 (1961).      However, the jurisprudence is replete with exceptions to this general rule. This court in *Hebert v. Travelers Insurance Co.*, 245 So.2d 563, 565 (La.App. 3 Cir.), *writ denied*, 258 La. 903, 248 So.2d 332

13

(La.1971), while acknowledging the general rule, used a mathematical formula to arrive at its award for general damages:

> Under this method, it is determined what the plaintiff's pain and suffering is worth in monetary terms for a given unit of time and then that figure is multiplied by the number of the said units of time contained in the expected duration of the pain and suffering. Thus a final figure is arrived at which supposedly represents a reasonable picture of what the amount of general damages should be. Although our Supreme Court has generally rejected the use of mathematical formulae in the determination of the amounts of damages, *Pennington v. Justiss-Mears Oil Co.*, 242 La. 1, 134 So.2d 53 [1961]; *McFarland v. Illinois Central Railroad Co.*, 241 La. 15, 127 So.2d 183 [1961], the unit-of-time argument was approved by our brothers of the First Circuit in *Little v. Hughes*, La.App., 136 So.2d 448 [1961].

Plaintiffs also note this court in *Moraus v. Frederick*, 05-429 (La.App. 3 Cir. 11/2/05), 916 So.2d 474, found the trial court's use of a per month award for injuries suffered to be appropriate under the law. As plaintiffs also point out, more relevant than the trial court's methodology in arriving at its awards of general damages, is whether the award rendered has a reasonable relationship to the damages proven and was within the trial court's vast discretion. *See Kilpatrick v. Alliance Cas. and Reinsurance Co.*, 95-17 (La.App. 3 Cir. 7/5/95), 663 So.2d 62, *writ denied*, 95-2018 (La. 11/17/95), 664 So.2d 406.

Georgia Gulf also argues the trial court's "across-the-board" mental anguish awards of $7,500 for each plaintiff in *Billiot* was an abuse of discretion. Georgia Gulf specifically asserts the testimony of the plaintiffs as to a "generalized fear of cancer" cannot support those awards because such "fear is unjustified and therefore not compensable." Georgia Gulf contends Dr. Levy, one of the plaintiffs' causation experts, could not say that any particular plaintiff was more likely than not to get cancer, and such "speculation cannot serve as the basis for an award of anxiety."

Dr. Levy unequivocally stated it was his expert opinion that the plaintiffs were at an increased risk to get cancer in the future. Dr. Levy stressed that vinyl

14

chloride, one of the chemicals to which the plaintiffs were exposed, was a known carcinogen. Plaintiffs also point to the reasoning in *Arabie*, 89 So.3d 307, wherein the supreme court affirmed a lower court's award for future injury relying on *Anderson v. Welding Testing Laboratory, Inc.*, 304 So.2d 351, 353 (La.1974), stating as follows:

> "While to a scientist in his ivory tower the possibility of cancerous growth may be so minimal as to be untroubling, we are not prepared to hold that the trier of fact erred in finding compensable this real possibility to th[ese] worrying workmen."

*Arabie*, 89 So.3d at 322.

Plaintiffs also call our attention to Dr. Levy's testimony concerning an epidemiology study addressing mental impact to a chemically exposed population. That study concluded that chemical exposure is "associated with a wide variety of psychological and physiological actions." Combining that with the plaintiffs' knowledge that they were at an increased risk for cancer in the future, supports the trial judge's mental anguish awards in *Billiot*.

Georgia Gulf also points to the fact that mental anguish awards were not made in *Anthony* and *Brown*. However, the record reveals the *Billiot* plaintiffs were the closest to the Georgia Gulf facility and were located in the area where high monitoring results were found on the night of the explosion. Further, the plaintiffs in *Anthony* were traveling, whereas the *Billiot* plaintiffs were primarily exposed while in their homes. Thus, the fact that mental anguish awards were not made in *Anthony* and *Brown* does not impugn the trial judge's conclusion in *Billiot* to award mental anguish for the fear of future injury.

Plaintiffs also cite *McDonald v. Illinois Central Gulf Railroad Co.*, 546 So.2d 1287 (La.App. 1 Cir.), *writ denied*, 551 So.2d 1340 (La. 1989), as support for the trial court's award of damages for mental anguish. *McDonald* involved a train derailment, with an ensuing explosion and fire that involved toxic chemicals.

The plaintiffs therein, a husband and wife, owned and were in a convenience store located approximately 250 feet from the derailment. The explosion blew out the front windows of the store. The plaintiffs in *McDonald* suffered no physical injuries, but were forced to evacuate for weeks, and could not return to the store even after the area evacuation ended due to high toxic levels in the store. The plaintiffs were awarded $30,000 and $20,000 in damages for mental anguish.

Georgia Gulf argues *McDonald* does not support the trial court's award of mental damages in the instant case, contending "nothing experienced by any of the plaintiffs in the case at bar comes close to the McDonald's experience." The *Billiot* plaintiffs concede "none of the plaintiffs herein had windows breaking as in *McDonald*, [but] some of the plaintiffs heard the explosion . . . [and] were all in the zone of danger." We also note the amount of damages for mental anguish awarded in *McDonald* (which was decided nearly 25 years ago), was substantially higher than that given to the *Billiot* plaintiffs, thus acknowledging the greater mental trauma experienced by the plaintiffs in *McDonald*. Thus, we agree with plaintiffs that *McDonald* lends support for the trial court's award of damages for mental anguish to the *Billiot* plaintiffs.

Considering the testimony of Dr. Levy as to the increased risk of cancer and the greater proximity to the explosion of the *Billiot* plaintiffs as compared to the plaintiffs in *Brown* and *Anthony*, we cannot say the trial judge in *Billiot* abused his vast discretion in awarding those plaintiffs $7,500 in damages for mental anguish.

Next, Georgia Gulf challenges each of the sixteen individual general damage awards made in *Billiot*. Although Georgia Gulf argues certain particulars of each award, there are recurring complaints common to each plaintiff. Georgia Gulf complains that most, if not all, of the plaintiffs had pre-existing problems and that many of them did not seek medical treatment as quickly as Georgia Gulf considered prudent and/or reasonable.

16

Plaintiffs note it was established by the medical testimony that persons with compromised immune systems (which was the primary pre-existing condition Georgia Gulf identified) have more difficulty withstanding problems caused by exposure to toxic chemicals. Moreover, pre-existing conditions would be more easily aggravated by such exposure. Plaintiffs point to the following reasoning by the supreme court in *Lasha v. Olin Corp.*, 625 So.2d at 1006, as authority for the proposition that a defendant cannot be shielded from responsibility for its negligent actions because a plaintiff may have been more predisposed to problems because of preexisting conditions:

> The record is clear that the plaintiff was especially predisposed or vulnerable to respiratory illness or injury due to years of heavy smoking. The defendant is liable for the harm it causes even though under the same circumstances a normal person would not have suffered that illness or injury. When the defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation.

Thus, it is clear any pre-existing conditions any particular plaintiff may have suffered from would not preclude an award of damages if it was proven that Georgia Gulf's admittedly tortious conduct aggravated those conditions.

As to Georgia Gulf's argument that many of the plaintiffs' damages awards should reflect a failure to timely seek medical attention, plaintiffs note the respective trial judges in *Anthony*, *Billiot* and *Brown I* rejected this argument because it found Georgia Gulf failed to adequately inform the public of the nature of the chemicals released. Judge Ritchie, in his written reasons in *Anthony*, noted Georgia Gulf's actions in informing the nearby communities of the serious nature of the chemical release to be lacking:

> Georgia Gulf made a deliberate and/or grossly negligent decision prior to, during and after, the explosion and resulting fire, to make sure there was minimal, if any, air monitoring outside of the plant in the most populated and heavily traveled areas closest to the Georgia Gulf plant, which made it impossible for Plaintiffs, or anyone else, to determine the amount of the multiple hazardous chemicals to which the public may have been exposed. The only air monitoring

17

performed off-site by Georgia Gulf was away from the more populated areas, which was performed by untrained employees, who, in spite of their lack of training, obtained readings that were indicative of a high level of chemicals in the air.

Judge Savoie, in his oral reasons for judgment in *Billiot*, similarly found:

 I think [Georgia Gulf] should have told the public:  This is what we figure has been released.  These are the risks that are involved, these are some doctors you can go see.  And if you have got complaints – that's the best way to solve it, it seems to me.  And people certainly have an opportunity at that point in time to either go see that doctor or go see another doctor, but at least they are aware of what their exposure risks are.

Judge Savoie specifically found "that [Georgia Gulf] didn't tell anybody what was being released."

Judge Davis also set forth the following in his oral reasons for judgment in *Brown I*, which reasons were cited with approval by this court:

I find that the release exceeded Georgia Gulf's estimate in both the volume released and the duration.  The evidence was compelling that the release of chemicals began before the fire started and continued beyond the time the fire was extinguished.  The estimate was low, because the release began earlier than they were willing to admit and continued later[.]

*Brown I*, 104 So.3d at 733.

Thus, we find the respective trial judges in this consolidated appeal had ample support for disregarding Georgia Gulf's argument that many plaintiffs were lax in seeking medical attention in the days following the exposure.

We turn our attention now to Georgia Gulf's challenges to the individual general damage awards made in *Billiot*.

**Maurice Billiot – ($35,500 general damage award).**

Mr. Billiot's list of symptoms included persistent coughing, headaches, sore throat, diarrhea, nausea, a rash and shortness of breath.  Many of these symptoms began on the night of the incident and others shortly thereafter.  Mr. Billiot testified he had significant problems sleeping due to the rash covering part of his body.  It was established Mr. Billiot's coughing, sore throat, nausea and diarrhea

cleared up after six months. However, the rash and persistent headaches did not abate, and Dr. Robert Looney noted on Mr. Billiot's visit of March 14, 2008 (approximately eighteen months after the incident) that he was still suffering from headaches and a rash. Georgia Gulf asserts Mr. Billiot's injuries support only an award of $4,000 to $6,000. No authority is listed in support of this amount.[3] We find the medical testimony shows no abuse of discretion in the award to Mr. Billiot.

**Lori Blanchard – ($28,500 general damage award).**

Ms. Blanchard complained of nausea and vomiting, chest congestion, coughing and headaches in the months after the exposure. Georgia Gulf attacks the amount of the award made to Ms. Blanchard because she did not complain of many of these symptoms when she was treated at a family care facility approximately two and five weeks after the incident. However, Ms. Blanchard testified she only complained on those visits of her primary and most serious complaint, her severe headaches. She testified she attempted to treat the other problems with over-the-counter medications, believing them at that time to be flu-like symptoms.

As was found by all three trial judges, the plaintiffs did not have the benefit of full disclosure from Georgia Gulf concerning any exposure to toxic chemicals. The trial judge in this case obviously found Ms. Blanchard's testimony credible and accepted as true that she only complained on those visits of her most troubling symptom, her headaches, not realizing other symptoms she suffered were related to the chemical exposure. Moreover, Dr. Looney, on his examination of Ms. Blanchard on September 21, 2007 (approximately one year following the incident), noted complaints of depression, anxiety, congestion and headaches, which he

---

[3]    For each plaintiff, Georgia Gulf offers this court a range of figures it contends is more appropriate for the injuries suffered. We note no cases are cited in support of the suggested amounts presented by Georgia Gulf.

related to the exposure. She also was diagnosed on that date with suffering from chronic bronchial irritation. We find the evidence does not indicate any abuse of the trial court's discretion in the award rendered to Ms. Blanchard.

**Florence Marie Cole – ($28,500 general damage award).**

The record established Ms. Cole had a pre-existing lung disease, chronic obstructive pulmonary disease. Dr. Looney opined that the exposure caused a significant aggravation of this condition. Dr. Levy also found Ms. Cole's increased trouble breathing, related to her increased asthma, was reasonably associated with the exposure. Ms. Cole also suffered sinus problems and endured flu-like symptoms due to the exposure. It was not until October 12, 2007 (nearly thirteen months after the incident), that Dr. Looney felt Ms. Cole was returning to her pre-exposure state of health. We find no abuse of discretion in the trial court's award to Ms. Cole.

**Tammye Cole – ($28,500 general damage award).**

Dr. Levy attributed Ms. Cole's complaints of an irritated throat, nausea, dizziness, persistent cough, shortness of breath and sinus problems to the exposure. Although, as Georgia Gulf contends, some of the symptoms abated within three months, others continued, particularly her sinus problems. Again Georgia Gulf argues Ms. Cole suffered from prior sinus problems; however, Dr. Looney noted her previous complaints of sinus problems were sporadic and she suffered an aggravation of these problems due to the exposure. We find no abuse of discretion in the trial court's award to Ms. Cole.

**Cody Degeyter – ($28,500 general damage award).**

Mr. Degeyter complained of persistent coughing, headaches, nasal irritation and dizziness which he related to the exposure. Georgia Gulf argues these symptoms were mild, but Mr. Degeyter testified he endured headaches and dizziness every day in the period after the accident. In his visit to Dr. Looney

20

approximately one year after the incident, he stated he still suffered from multiple headaches per week and daily coughing attacks, which sometimes included coughing up blood. We find the trial court did not abuse its discretion in the award rendered to Mr. Degeyter.

**Claude Doran – ($31,500 general damage award).**

Mr. Doran testified he suffered from severe headaches for over one year after the exposure. The headaches were so severe and persistent that Dr. Looney referred Mr. Doran to a specialist, Dr. Fayez Shamieh, a neurologist. Georgia Gulf's argument against the award rendered to Mr. Doran is that he did not complain of headaches until "a week or two" after the Georgia Gulf incident and they did not become severe until much later. However, the plaintiffs note Dr. Shamieh explained that Mr. Doran's exposure caused contractions of blood vessels, which blocked the oxygen and blood supply, causing headaches. When asked how long it would take for chemical exposure to cause these contractions, Dr. Shamieh testified it could be anywhere from days to weeks. Thus, Georgia Gulf's argument is without merit, and we find no abuse of the trial court's discretion in the award rendered to Mr. Doran.

**James Gibson – ($28,500 general damage award).**

Mr. Gibson suffered from eye irritation nasal irritation, sinus problems, a rash, persistent coughing and shortness of breath. Unlike the other *Billiot* plaintiffs, it was established that Mr. Gibson's exposure was brief and limited to his driving through a cloud of smoke on the night of the incident. Despite this, Dr. Looney related Mr. Gibson's problems to the exposure and further testified that Mr. Looney was particularly susceptible to the effects of chemical exposure due to his obesity. Three years following the incident, Mr. Gibson was still suffering from a rash and shortness of breath. We find no abuse of the trial court's discretion in the award rendered to Mr. Gibson.

21

**Beverly Hanney – ($28,500 general damage award).**

Ms. Hanney complained of sore throat, sinus congestion and sneezing symptoms, which continued to bother her for over one year after the exposure. Georgia Gulf disputed the amount of the award on the basis of pre-existing problems. Dr. Looney acknowledged Ms. Hanney had a pre-exposure allergic disposition, but found this condition was aggravated by the exposure. Both Dr. Looney and Dr. Levy related Ms. Hanney's injuries to the incident, which the trial court obviously accepted as credible. We find no abuse of discretion in the trial court's award to Ms. Hanney.

**John Hanney – ($28,500 general damage award).**

Mr. Hanney complained of headaches, dizziness and sinus problems. When Dr. Looney first saw Mr. Hanney approximately two months after the incident, there appeared to be improvement in the frequency and severity of Mr. Hanney's symptoms. However, Mr. Hanney returned to Dr. Looney in September of 2007 complaining of sinus problems, sneezing and severe headaches which occurred several times per week. Dr. Looney candidly acknowledged he had a difficult time assessing Mr. Hanney due to his allergies, but also noted he had a sensitivity to chemicals. He admitted he was unsure as to whether the problems Mr. Hanney was suffering from were related to the exposure, but certainly could not rule it out. The trial court assessed the medical evidence pertaining to Mr. Hanney, evidently concluding the symptoms were related to the exposure and rendered an award to Mr. Hanney in accordance with that factual determination. We cannot say the trial court abused its vast discretion and affirm the award to Mr. Hanney.

**Courtney Hetzler – ($22,500 general damage award).**

The medical testimony established Ms. Hetzler suffered from dizziness, sore throat, nausea and severe headaches for approximately one year after the exposure.

She testified the headaches often lasted all day and severely impacted her daily activities. We find no abuse of discretion in the award made to Ms. Heltzer.

**Erica Johnson – ($18,500 general damage award).**

Ms. Johnson sought treatment for headaches, dizziness, fatigue and nausea. She had particular difficulty with headaches, and when they continued to occur, she sought treatment with Dr. Looney, who related the fatigue, nausea and headaches to the exposure. Georgia Gulf argues the award should be reduced, because Dr. Looney believed Ms. Johnson was approaching her baseline state of health when he examined her approximately six months following the incident. The trial court undoubtedly considered this shorter duration of symptoms as compared to other *Billiot* plaintiffs, and this was reflected in the fact Ms. Johnson received the smallest general damage award rendered. Thus, we find no merit in Georgia Gulf's argument and affirm the award made to Ms. Johnson.

**Hershel Jordan – ($34,500 general damage award).**

Following his exposure, Mr. Jordan complained of dizziness, nausea, coughing, headaches and shortness of breath. Georgia Gulf contends Mr. Jordan was unable to prove any of his symptoms lasted more than a few days, therefore the award rendered to him was excessive. However, Mr. Jordan did testify some of his symptoms cleared up within a short period but that several others persisted much longer. Approximately two months after the accident, Dr. Looney's examination revealed problems in Mr. Jordan's lungs and abnormal sinus x-rays. Dr. Looney unequivocally stated the abnormal sinus x-rays were related to the exposure. Furthermore, Dr. Looney found Mr. Jordan's pre-exposure cancer and lung problems made it increasingly difficult for him to recover from the problems caused and/or exacerbated by the exposure. Dr. Looney could not say if Mr. Jordan would ever regain his pre-exposure state of health. Thus, we find no abuse of discretion in the award rendered to Mr. Jordan.

**Clarence LeBlanc – ($28,500 general damage award).**

Mr. LeBlanc was riding with James Gibson on the night of the incident when the two drove through a chemical cloud. Mr. LeBlanc's primary complaints consisted of upper respiratory problems, loss of smell and headaches. Georgia Gulf argues Mr. LeBlanc has suffered from headaches since 2001, when he started going blind. It contends because the headaches are attributable to other causes, they are not compensable and Mr. LeBlanc's award must be reduced. Plaintiffs counter that the pain management records for Mr. LeBlanc depict an increase in both the frequency and severity of Mr. LeBlanc's headaches after the exposure. His medication was correspondingly increased to alleviate his suffering. Dr. Looney attributed this increase in headaches and the continuing problems with his upper respiratory tract to the exposure. The trial court found Dr. Looney's opinions persuasive, and we find no abuse of discretion in Mr. LeBlanc's award.

**Dewey Maynard – ($40,500 general damage award).**

Mr. Maynard testified he suffered from headaches, increased cough, sinus problems, neuropathy and depression. It was established that Mr. Maynard had pre-existing problems with neuropathy and depression. Georgia Gulf argues that Mr. Maynard was unable to relate his problems to the exposure. However, plaintiffs note Dr. A.J. O'Byrne, the ophthalmologist who treated Mr. Maynard, opined the exposure increased his dry eye condition and contributed to his superficial punctuate keratopathy on both corneas. Dr. Looney also related Mr. Maynard's headaches and upper respiratory problems (which lasted approximately one year) to the exposure. We find no abuse of discretion in the award.

**Bettie Wilkins – ($28,500 general damage award).**

Georgia Gulf contends this award was excessive because Ms. Wilkins had a pre-existing condition, chronic obstructive pulmonary disease. However, Dr. Looney testified this pre-existing condition was aggravated by the exposure and

24

her symptoms increased as a result. In addition, because of her condition, Dr. Looney noted she was highly susceptible to the effects of the toxic chemicals released in the explosion and fire at the Georgia Gulf plant. Although Dr. Looney stated it was difficult to ascertain "how much or what amount" the exposure may have increased her symptoms, he was clear that it did aggravate her problems. Thus, we find no abuse of discretion in the award rendered to Ms. Wilkins.

**Brittany Wilkins – ($28,500 general damage award).**

Ms. Wilkins complained of dizziness, headaches, nausea, sinusitis and shortness of breath, which was an aggravation of her pre-existing asthma condition. Dr. Looney related these problems to the exposure. Georgia Gulf argues any symptoms related to the exposure lasted only one week, but that ignores testimony from Ms. Wilkins that her symptoms would come and go, and that her sinus problems were continual for several months. Most importantly, it was not until August 25, 2007 (nearly one year after the incident), that Dr. Looney found Ms. Wilkins was "rapidly returning to her previous state of health and basically back to that state." Thus, we cannot say the trial court abused its discretion in the award rendered to Ms. Wilkins.

**B.     The *Brown II* Awards.**

Initially we note, unlike the awards made by the trial court in *Billiot*, there were no separate awards made for mental anguish in *Brown II* and *Anthony*. That element of damages, if applicable, was part of the general damage awards for the *Brown II* and *Anthony* plaintiffs.

**Amya Denae Allison – ($20,000 general damage award).**

Amya was nearly four years old at the time of the incident. It was contended she suffered from sinus congestion, runny nose, cough and throat irritation. Amya was treated at a children's clinic and then by Dr. Mouton. Georgia Gulf asserts the general damage award is too high in this case because

Amya had similar symptoms before the exposure. However, Amya's mother testified the symptoms prior to the exposure were not nearly as severe and would abate in a few days. Dr. Mouton testified that the exposure caused an aggravation of Amya's pre-existing problems which led to more frequent attacks and infections. We find no abuse of discretion in the award rendered to Amya.

**Ralph Campbell – ($20,000 general damage award).**

Dr. Looney found Mr. Campbell suffered from daily headaches, dizziness, fatigue and loss of smell and taste. Many of these symptoms were present well over a year after the incident. Georgia Gulf's argument is that Mr. Campbell was a chronic smoker with a history of poor health, including chronic pulmonary disease. Dr. Looney opined that there was "no doubt" that the exposure aggravated Mr. Campbell's pre-existing conditions. Mr. Campbell died before trial, and his daughter described her father's condition after the exposure as "flu-like symptoms that never went away." The trial court did not abuse its discretion in the award rendered to Mr. Campbell.

**Sharon Comeaux – ($25,000 general damage award).**

Ms. Comeaux complained of burning eyes, a runny nose, nausea, headaches and a rash. Georgia Gulf maintained her symptoms were either short in duration (less than a week) or attributable to other causes. Plaintiffs note Dr. Looney was still treating Ms. Comeaux for her throat problem eighteen months following the incident. Dr. Looney related her throat problems to the exposure. There were also noted sleeping problems, due largely to anxiety, which Dr. Looney related to the exposure. We find no abuse of discretion in the award.

**James Daniel – ($12,000 general damage award).**

Mr. Daniel's symptoms included headaches, dizziness, cough and insomnia, which lasted for approximately seven months. Dr. Levy and Dr. Looney attributed these problems to the exposure. Dr. Looney also believed Mr. Daniel's recovery

26

was slowed by his exposure-related anxiety. We find the general damage award of $12,000 rendered to Mr. Daniel was not abusively high.

**Arlene Griffin – ($50,000 general damage award).**

Ms. Griffin complained of frequent nosebleeds with loss of smell, cough, fatigue and headaches. Georgia Gulf argues Ms. Griffin's symptoms were not of such a significant duration to receive such a large award. Dr. Looney related her symptoms to the exposure. Further, Dr. Looney found Ms. Griffin was still having nosebleeds and sinus problems nearly one year after the incident. Ms. Griffin also testified although the frequency of the nosebleeds decreased over the course of the year, she still had multiple nosebleeds per week and they would last all day. Ms. Griffin, who was a cancer survivor, also testified she was extremely concerned and stressed over the possibility of again developing cancer due to her exposure. We cannot say the trial court abused its discretion in the award made to Ms. Griffin.

**Mark Griffin – ($35,000 general damage award).**

Mr. Griffin complained of burning eyes, coughing, upper respiratory and nasal irritation and diarrhea. Georgia Gulf argues the award is too high because Mr. Griffin was a smoker and his symptoms resolved within a relatively short time. Although Mr. Griffin was a smoker, there was testimony that he did not suffer from his symptoms prior to his exposure. Plaintiffs also dispute Georgia Gulf's assertion that Mr. Griffin's symptoms were short-lived, noting he was diagnosed by Dr. Looney as continuing to suffer from respiratory and nasal issues six months after the exposure, as well as continuing to have shortness of breath problems. Mr. Griffin also testified he feared long term effects from the exposure for him as well as his family. Thus, we find no abuse of discretion in this award.

**Sonji Griffin – ($20,000 general damage award).**

Ms. Griffin's symptoms included headaches, sore throat, a rash and dizziness. Dr. Levy attributes the symptoms to her exposure. The headaches

27

troubled Ms. Griffin for approximately one year before gradually lessening. She was also bothered by a rash across her upper chest. Dr. Looney noted Ms. Griffin had difficulty recovering from her symptoms due to her anemia. There was no abuse of discretion in the award rendered to Ms. Griffin.

**Christa Rochelle Grimh – ($40,000 general damage award).**

Christa, who was almost eleven years old at the time of the incident, suffered from burning eyes and headaches. The burning in her eyes abated shortly thereafter, but the headaches persisted. Because her headaches persisted, she was sent to specialists, Dr. Jagjit Chadha and then Dr. Shamieh. On numerous occasions the school nurse would call Christa's mother to pick her up at school because of headache complaints. Christa saw Dr. Shamieh several times, the last being fifteen months after the exposure, before the management of her headaches became tolerable. We find no abuse of discretion in this award.

**Scott Grimh – ($45,000 general damage award).**

Mr. Grimh's symptoms included burning in his eyes, sinus congestion, headaches, nausea and dizziness. Dr. Levy related these symptoms to his exposure. Due to the frequency and severity of his headaches, Mr. Grimh was referred to Dr. Chadha and then Dr. Shamieh. Dr. Chadha found Mr. Grimh's nausea was linked to his headaches. He treated with Dr. Shamieh through December of 2007, approximately fifteen months after the incident. Mr. Grimh described his headaches as debilitating and lasting all day. Mr. Grimh owned a business that developed rental properties, for which Mr. Grimh did most of the labor. The headaches forced him to hire outside help to perform the labor he would normally do, and this cost him $28,282.21. Dr. Looney testified it was reasonable for Mr. Grimh to miss work because of his headaches. We find no abuse of discretion in this award.

28

**Richard Hicks, Jr. – ($10,000 general damage award).**

Mr. Hicks' symptoms included chest congestion, diarrhea, dizziness, sinus and throat problems and headaches. Dr. Looney related these problems (some of which were an aggravation of his pre-existing lung condition) to the exposure. It was established that several of Mr. Hicks' problems lasted for three months or more, which would justify his relatively small award.

**Madisyn Holland – ($25,000 general damage award).**

Madisyn, who was twenty-two months old when the incident occurred, suffered from dizziness, headaches, nausea and cough according to her mother. Georgia Gulf's argument against this award is largely based on its contention that Madisyn's mother did not timely seek medical attention. This argument was addressed previously, when we noted Georgia Gulf's failure to properly inform the surrounding community of the potential hazards from the exposure. Plaintiffs also note Dr. Levy's testimony that many people often will not immediately go to the doctor to treat what appears to be flu-like symptoms. As Dr. Levy related Madisyn's symptoms to the exposure, we cannot say the trial court abused its vast discretion in the award rendered.

**Shelley Holland – ($12,000 general damage award).**

Ms. Holland complained of insomnia, nausea, bronchial and sinus irritation, headaches and anxiety. It was established Ms. Holland had pre-existing problems with headaches and anxiety, but she testified her headaches were more severe after the exposure and her anxiety worsened. Approximately four months after the incident, Dr. Looney noted Ms. Holland continued to suffer from insomnia and bronchial and sinus irritation, which he related to her exposure. We find no abuse of discretion in the trial court's award to Ms. Holland.

**Cyn'dreika Jackson – ($10,000 general damage award).**

Cyn'dreika, who was four years old at the time of the incident, was treated for respiratory and eye symptoms. Georgia Gulf notes these symptoms lasted "four to five months," which we find adequately justifies the trial court's award to Cyn'dreika.

**Stacy McZeal – ($18,000 general damage award).**

Mr. McZeal complained primarily of sinus problems; along with burning eyes and skin irritation. He did suffer from pre-existing sinus problems, that both Drs. Levy and Looney found were aggravated by the exposure. Georgia Gulf again criticizes Mr. McZeal for "self-treating" his sinus symptoms rather than immediately seeking medical attention. Four months after the exposure, Dr. Looney was unable to opine when Mr. McZeal would return to his pre-exposure state of health. Mr. McZeal also testified he suffered from anxiety and stress as a result of the exposure. He related his decision to change jobs and move from Westlake to his fears from the incident. We cannot say the trial court abused its discretion in the award rendered to Mr. McZeal.

**Mariah Miles Harrison – ($10,000 general damage award).**

Ms. Harrison complained of dizziness, shortness of breath and headaches, which Dr. Levy related to the exposure. The headaches and dizziness resolved within three months, but she continued to have problems with shortness of breath. Over three months after the exposure, Dr. Mouton found objective findings of nasal congestion. Dr. Mouton was concerned enough over her health to recommend a pulmonary function test. We find no abuse of discretion in the trial court's award of $10,000 in general damages.

**David Olivier – ($35,000 general damage award).**

Mr. Olivier complained of sore throat, burning in his eyes, headaches and the recurrence of asthma. The sore throat and eye problems resolved within three

months, but he had ongoing problems with the headaches and asthma. Mr. Olivier continued to suffer from headaches in excess of one year after the exposure. Dr. Looney testified he noted objective findings in both lower lung fields on May 12, 2007, which explained the recurrence of Mr. Olivier's asthma, which had not bothered him since childhood. We find no abuse of discretion in the award rendered to Mr. Olivier.

**Monica Olivier – ($10,000 general damage award).**

Ms. Olivier suffered from headaches and sinus problems as a result of her exposure. Dr. Looney's examination of Ms. Olivier over two months after the incident, noted problems with headaches and her sinuses. Over a year after the incident, Dr. Looney still found objective signs of sinus congestion. There is no abuse of discretion in this award.

**Amanda Faye Owen – ($22,000 general damage award).**

Ms. Owen complained of headaches and a respiratory tract irritation, which Dr. Levy related to the exposure. In February of 2007, she complained of continuing headaches to Dr. Mouton, who recommended she undergo a neurology consult. Dr. Mouton also found Ms. Own suffered from "chronic sinus congestion of the nose." We find no abuse of discretion in Ms. Owen's general damage award.

**Makynzie Owen – ($16,000 general damage award).**

Makynzie, who was approximately five years old at the time of the incident, suffered from respiratory irritation, eye irritation, runny nose and coughing. Her mother initially treated her symptoms with over-the-counter medication. She then was treated at a local clinic in December of 2006 and January of 2007. Dr. Mouton saw Makynzie on February 9, 2007 (approximately five months after the incident), and found her to be suffering from sore throat, respiratory irritation and eye irritation, which he attributed to the exposure. Makynzie was referred to a

31

specialist for her respiratory issues.  We find no abuse of discretion in the award to Makynzie.

**Willie Rosamore – ($25,000 general damage award).**

Mr. Rosamore, who died on November 9, 2009, suffered from respiratory and eye problems following the exposure.  It was established Mr. Rosamore had pre-existing respiratory problems, but Dr. Looney testified the exposure "caused an aggravation of his pre-existing respiratory problems."  Dr. O'Byrne, who treated Mr. Rosamore for his eye problems, found his significant decrease in vision was related to the exposure.  Mr. Rosamore's son testified his father's demeanor changed due to his problems after the incident, noting he was "distant and anxious and almost depressed."  We find the medical evidence reveals no abuse of discretion in this award.

**Kaylin Trahan-Pena – ($10,000 general damage award).**

Georgia Gulf's argument against this award is that Kaylin's mother failed to seek medical attention for her nasal congestion and headaches until weeks after the incident.  This repetitive argument ignores the testimony of Kaylin's mother that she attempted to treat the symptoms at home with over-the-counter medication, and when that failed she then sought treatment for Kaylin from Dr. Mouton.  Dr. Mouton found objective signs of problems with Kaylin and prescribed medication. We find no abuse of discretion in the trial court's award to Kaylin.

**Latonya Trahan – ($15,000 general damage award).**

Ms. Trahan complained of eye irritation, nasal congestion, sore throat, nausea, insomnia and headaches were attributed to the exposure by Dr. Levy. Within two months of the incident, when Dr. Looney saw Ms. Trahan, the eye irritation, sore throat and nausea had cleared up.  Dr. Looney believed at that time that in an additional six weeks she would likely return to her baseline state of health.  However, she still reported some problems in September of 2007 when she

was examined by Dr. Looney, though she did feel she had improved. Ms. Trahan also testified she experienced anxiety after the exposure, and developed a fear of cancer. We find no abuse of discretion in the trial court's award to Ms. Trahan.

**Brandi Victorian – ($40,000 general damage award).**

Ms. Victorian went to the emergency room on the night of the incident, complaining of breathing problems. She was diagnosed with an inhalation injury and prescribed albuterol to help with breathing. Her breathing problems resolved, but she testified she suffered from headaches and sinus problems. Georgia Gulf points to the fact that Ms. Victorian's medical treatment had a significant gap between visits to a physician. She testified she was told there was little she could do for her problems but hope they abated in time, so she attempted to continue her daily activities. She was seen by Dr. Mouton in August of 2007, and he noted objective signs of the inhalation injury present. Considering its vast discretion, we cannot say the trial court abused its discretion in the award of damages to Ms. Victorian.

C. **The *Anthony* Awards.**

In *Anthony*, Georgia Gulf appeals only two of the eleven awards rendered in that case. Initially, Georgia Gulf notes the awards made to the other nine plaintiffs in *Anthony* range from $500 to $7,500, the implication being that the two awards to Wofford and Martzall are disproportionately high. Plaintiffs argue the facts bear out the higher awards to those two plaintiffs.

**Patsy Wofford – ($40,000 general damage award).**

It was established that seven days after her exposure, Ms. Wofford suffered a heart attack. Dr. Levy and Dr. Looney related Ms. Wofford's heart attack to her exposure. Dr. Levy specifically found Ms. Wofford's "[p]hysiological and psychological stress contributed to her acute myocardial infarction." Plaintiffs

33

note Georgia Gulf presented no evidence to dispute Dr. Levy and Dr. Looney's conclusion in this regard.

It was also noted by Dr. Khan that Ms. Wofford's asthma was greatly exacerbated by her exposure. After the exposure she was prescribed a stronger asthma medication and required use of her inhaler five times per day rather than once a day prior to the exposure. Ms. Wofford also testified she suffered from increased fatigue and persistent coughing. Ms. Wofford maintained she was forced to change employment due to her fatigue and shortness of breath. More than one year after the accident, Dr. Looney examined Ms. Wofford and found she had improved but was still having problems from the exposure. Noting the testimony of Drs. Levy, Looney and Khan we find no abuse of the trial court's discretion in the $40,000 general damage award to Ms. Wofford.

**Dorothy Martzall – ($10,000 general damage award).**

It was noted by both sides that Ms. Martzall had previous heart and lung problems. However, she testified her health had "really gone down" since the exposure. Ms. Martzall stated she suffered from constant coughing, severe headaches and persistent fatigue, all of which impeded her daily activities.

Ms. Martzall was treated shortly after the accident, and was examined by Dr. Looney on October 23, 2006. Dr. Looney concluded Ms. Martzall had several pre-existing problems that were aggravated by her exposure. Dr. Looney noted an objective finding of irritation of the nasal lining, which significantly exacerbated her coughing and sinus conditions. Dr. Looney continued to treat Ms. Martzall over an approximate two-year period and detected little, if any, improvement.

Georgia Gulf's primary argument against the amount of general damages awarded to Ms. Martzall, was based on its assertion that there is no competent evidence to confirm any aggravation of her symptoms. However this assertion is contradicted by the above cited testimony of Dr. Looney which attributed

significant and longstanding aggravations of her health problems to the exposure. Thus, we find no abuse of the trial court's discretion in the award made to Ms. Martzall.

## DECREE

For the foregoing reasons, the judgments of the lower courts are affirmed in all respects. All costs of this appeal are assessed to defendant-appellant, Georgia Gulf Lake Charles, LLC.

**AFFIRMED.**